**J. IRIZARRY y PUENTE, Plaintiff, Appellant,**

v.

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE et al., Defendants, Appellees.**

No. 5252.

United States Court of Appeals
First Circuit.

Oct. 28, 1957.

Timothy J. McInerney, Boston, Mass., for plaintiff-appellant.

J. Irizarry y Puente, pro se.

Charles B. Rugg, Boston, Mass., with whom Oscar M. Shaw, James Vorenberg, Joan Toland Bok and Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., on the brief for appellees.

Before MARIS, WOODBURY and HARTIGAN, Circuit Judges.

MARIS, Circuit Judge.

The plaintiff has appealed from the summary judgment of the District Court for the District of Massachusetts dismissing his complaint against the defendants, the President and Fellows of Harvard College and Erwin N. Griswold, Dean of the Harvard Law School. The complaint alleged in essence that a series of reports on foreign tax systems which the Harvard Law School is preparing makes use of an idea which the plaintiff owned exclusively and which the defendants stole from him. Counts one and four of the complaint allege that the defendants converted to their own use the plaintiff's idea for a tax service disclosed in correspondence between the plaintiff and Griswold in 1950. Counts two and three allege that Griswold deceived the plaintiff into disclosing his plans for a tax service. Damages, an accounting for profits, and injunctive relief were sought.

The plaintiff based his claim upon correspondence passing between himself and Griswold in the spring and summer of 1950. Admittedly there were no other contacts between the parties. The correspondence began with a letter of May 17, 1950 from the plaintiff to Griswold which sought to enlist Griswold's cooperation in looking over the text of a loose-leaf service on Argentine tax law which the plaintiff had prepared and which he planned to follow with similar services on the tax law of other Latin-American

nations. The plaintiff stated in the letter that these services were to be "along the lines of the Tax Services published in this country on federal and state taxes by Prentice-Hall or Commerce Clearing House" and that he planned to divide the material into two parts, Part I to be "a text statement of the law on taxation" based "on the statutes, regulations, administrative decisions, court decisions, executive decrees, etc." and Part II to consist "of the annotated statutes, along the lines of U. S. Code Annotated." A copy of the format of Part I was enclosed. In the letter the plaintiff also stated that a "survey has been conducted among 1500 important business and banking institutions and leading law firms throughout the country in order to determine the measure of interest in such Service, and that the response has been considerable and very favorable."

Griswold replied under date of May 22, 1950 that he found himself interested and requested further information as to just what he would be expected to do and the terms proposed. By letter of May 25, 1950 the plaintiff outlined to Griswold the contemplated steps in the proposed publication, giving further information as to the part Griswold was to take in it and some general suggestions as to compensation. Griswold's job was stated to be to see that the "statement of Argentine law as given in Part I" was in such form that it would "be understood by an American executive or lawyer." Replying on the same day Griswold wrote the plaintiff that he remained interested but still felt the need for more specific and definite information. The plaintiff then wrote Griswold under date of May 29th suggesting a meeting. A copy of the format of Part II of the Argentine Federal Tax Law Service consisting of about 50 pages of printed text was mailed to Griswold. The remainder of the correspondence was devoted solely to the effort to arrange a meeting. The effort was unsuccessful, the two men never met, and the correspondence ended with a letter from Griswold dated August 18, 1950 in which he informed the plaintiff that he did not "care to pursue the matter further".

The plaintiff's Argentine Federal Tax Law Service, to which he referred in his letters to Griswold, was published and copyrighted in 1951. It is a large loose-leaf service with text and annotations of the statutes and regulations and analytical material, priced at $300.

The Harvard Law School, in cooperation with the United Nations, is engaged in the preparation and publication of a series of reports on national tax systems of countries throughout the world known as the "World Tax Series". It was stated at bar that the first two of these reports, those for the United Kingdom and Brazil, were published in the spring of 1957 after the entry of the judgment here on appeal. The project for these reports grew out of discussions starting in October 1950 between representatives of the United Nations and the Harvard Law School. Ever since 1947 the Fiscal Commission of the United Nations has had the responsibility of gathering information on international finance systems to be published in the form of loose-leaf services with an International Tax Law Reporter as a part thereof. In 1951 the Fiscal Commission and the Economic and Social Council of the United Nations passed resolutions approving and authorizing the project of publishing a world tax service with the possible cooperation of universities in the undertaking. Pursuant to these resolutions the cooperation of Harvard University was enlisted but work was not started until 1954 when financial support was secured. A prototype submitted to the District Court, which conforms to one of the subsequently published volumes produced at bar, shows that they are comparatively small permanently bound books summarizing a country's tax system. The price of the United Kingdom and Brazilian reports is stated to be $15.00 and $10, respectively.

The defendants moved for summary judgment in their favor. Affidavits and

depositions were filed by both parties from which the District Court concluded that there was no genuine issue as to any material fact. The District Court granted the defendants' motion on the ground that there was nothing novel or original in the idea of a foreign tax service which the plaintiff disclosed to Griswold and that the plaintiff accordingly had no proprietary rights in that idea upon which to base his complaint.

■ The judgment of the District Court must be affirmed because of the lack of novelty and originality of the plaintiff's idea. The reasons for reaching this conclusion are ably stated in the opinion filed in the District Court by Chief Judge Sweeney, 149 F.Supp. 33, with which we are in full accord. We need only point out here that in contending that it was immaterial whether the idea of a foreign tax service which he disclosed to Griswold was a novel one the plaintiff mistakenly relies upon the rules laid down in copyright cases. It may be conceded that if the defendants were being charged with having copied the text of the plaintiff's copyrighted Argentine Federal Tax Law Service it would be immaterial that the idea of a foreign, or even an Argentine, tax law service was an old and well known one. But the plaintiff does not suggest that the defendants copied the text of his loose-leaf foreign tax law service; he says that they stole from him the idea of publishing such a service. However, unless that idea was a novel and original conception with him he had no property right in it which he could enforce as against the defendants. Smoley v. New Jersey Zinc Co., 3 Cir. 1939, 106 F.2d 314.

The defendants urge that the judgment may be supported upon other grounds. While the ground taken by the District Court is sufficient we think it proper to discuss two of these other grounds briefly since we agree that they, too, support the judgment.

■■ The unconditional public dis-closure of an idea by the originator makes it the property of all and operates to deprive the originator of any further proprietary rights in it. Bristol v. Equitable Life Assur. Soc. of United States, 1892, 132 N.Y. 264, 30 N.E. 506; Havighurst, The Right to Compensation for an Idea, 1954, 49 Northwestern U.L.Rev. 295, 301. Here the plaintiff informed Griswold in his first letter that he had already disclosed his idea to "1500 important business and banking institutions and leading law firms throughout the country". Moreover the complaint itself states that "In 1949 the plaintiff caused to be printed a limited number of copies of the formats of Parts I and II in their final form, each format consisting of about fifty pages of printed text, and the said printed formats were used by plaintiff to secure pre-publication orders for the Argentine volume or service, and based on such formats, a number of orders were so secured." Thus the plaintiff had no basis for a claim against the defendants even if we should assume that the idea had been novel and original with him before such disclosure and that it was actually taken and used by the defendants.

■■ An idea, as distinguished from the copyrighted contents of a book or a patented device or process, is accorded no protection in the law unless it is acquired and used under such circumstances that the law will imply a contractual or fiduciary relationship between the parties. Chadwick v. Covell, 1890, 151 Mass. 190, 23 N.E. 1068, 6 L.R.A. 839. In the present case it is perfectly clear that no such implied contractual or fiduciary relationship arose. For the plaintiff's initial letter to Griswold, which was wholly unsolicited, disclosed and described the plaintiff's entire idea. All that Griswold ever requested from the plaintiff was further information as to the part the plaintiff wished him to take and the financial arrangements which the plaintiff proposed. Such a gratuitous unsolicited disclosure as the plaintiff made to Griswold could not impose upon the defendants a contractual or fiduciary relationship. Gromback Productions v. Waring, 1944, 293 N.Y. 609, 59 N.E.2d

425; Laughlin Filter Corp. v. Bird Machine Co., 1946, 319 Mass. 287, 65 N.E. 2d 545.

The judgment of the District Court will be affirmed.