Roger BURTEN, d/b/a Rainy Day Games & Toys and Allen K. Coleman, d/b/a Micro-Pro Electronic Consultants, Plaintiffs,

v.

MILTON BRADLEY COMPANY, Defendant.

Civ. A. No. 81–0331 S.

United States District Court,
D. Rhode Island.

Aug. 14, 1984.

Wistow, Barylick & Bruzzi, Inc., Max Wistow, John P. Barylick, Suzanna Mitchell, Providence, R.I., for plaintiffs.

Hill & Barlow, Gael Mahony, John A.D. Gilmore, Thomas Griffith, Boston, Mass., Vetter & White, George M. Vetter, Providence, R.I., for defendant.

OPINION

SELYA, District Judge.

The plaintiffs in this case, Allen Coleman and Roger Burten, are independent game inventors. The defendant, Milton Bradley Company (MB), is a colossus which has stood astride the toy and game industry for many a moon. Jurisdiction is bottomed on diversity of citizenship and the existence of a controversy in the requisite amount. 28 U.S.C. § 1332. The parties (who agree on little else) do not dispute that the substantive issues of this litigation are governed by Massachusetts law. Accordingly, that law controls. *In re Pioneer Ford Sales,* 729 F.2d 27, 31 (1st Cir.1984); *Lopez v. Bulova Watch Co.,* 582 F.Supp. 755, 757 n. 1 (D.R.I.1984).

This suit is premised on the plaintiffs' claim that the defendant misappropriated a supposedly novel combination of ideas and technology conjured up by Coleman and Burten, who had pooled their talents in an effort to scale new home entertainment heights. The alleged trade secret was embodied in "Triumph," an electronic board game which the plaintiffs invented. Hoping to sell their creation, Coleman and Burten jointly submitted a version of the game to MB for consideration. After some lapse of time, the proffer was ultimately rejected. Approximately one year later, the plaintiffs, much to their dismay, discovered that MB was introducing an electronic board game called "Dark Tower." Identifying, among other things, certain structural similarities between Dark Tower and Triumph, the plaintiffs accused MB of commercial piracy and filed suit.

A lengthy trial ensued. The jury found that MB had indeed misappropriated the plaintiffs' idea and awarded Coleman and Burten substantial compensatory damages. The parties thereupon filed a number of post-trial motions. Advancing several supporting rationales, MB moved for judgment notwithstanding the verdict and for a new trial. The plaintiffs filed a motion to amend the judgment to add prejudgment interest and a motion to double the damages pursuant to Mass.Gen.Laws Ann. ch. 93, § 42. All of these motions were briefed in a plethoric fashion, and the parties stipulated to the waiver of oral argument.

In accordance with the standard of review applicable to the defendant's motion for judgment notwithstanding the verdict (which is indistinguishable from the standard for decision on a motion for directed verdict), the court presents the "evidence and any reasonable inferences therefrom ... in the light most favorable to the nonmoving party" (here, the plaintiffs). *de-Mars v. Equitable Life Assurance Society,* 610 F.2d 55, 57 (1st Cir.1979).

I.

*A. Facts*

An understanding of this litigation necessarily involves an appreciation of the state of the art in the toy and game industry just prior to the events that culminated in the suit. Early in the 1970s, the emergence of the microcomputer chip precipitated a broadscale technological revolution. Increasingly, electronic toys and games, i.e., those containing microcomputer chips, commanded an important and burgeoning share of the market. But, by the end of the decade, the proliferation of hand-held electronic gadgetry [1] had created a glut. Buoyed by its theory that electronics were key to continued growth and success, MB perceived the need to break away from the hand-held configuration and to develop new and more sophisticated electronic products. MB was not alone in such sentiments; and titans of the trade soon became caught up in a well-funded race to achieve this end.

One particularly coveted goal of this product chase was the development of an electronic board game which would fully integrate a microprocessor and a tradition-

---

1. Examples of such items included MB's "Simon," a large disc about one foot in diameter; "Baseball," entirely contained within an apparatus resembling a standard calculator; and "Stop Thief!", a board game which included an unattached unit which likewise had a calculator-like appearance.

al-type board game.[2] Indeed, by late 1979, MB's inside inventors were devoting considerable amounts of time to the problem. Yet, despite herculean efforts, neither MB nor any other company had managed to harness these elements or to tame the hydra-headed beast.

Meanwhile, the plaintiffs had embarked on the joint venture which would eventually produce Triumph (if not triumph). Burten, a marginally successful game and toy inventor doing business under the name and style of Rainy Day Games & Toys, also wanted to create an electronic board game. He needed someone to design and develop the electronics. Ironically, it was while Burten was at the MB plant, discussing a notion for an unrelated item, that he heard about Coleman. A self-employed engineer doing business as Micro-Pro Electronic Consultants, Coleman was a former senior electronics development engineer for MB. At Burten's request, Coleman met with him in November, 1979. The two agreed that when a viable idea for a game sprang from Burten's brow, Coleman would lay out and insert the necessary electronics. They agreed to split both cost and, hopefully, profit. Neither plaintiff was a babe in the woods; each was a sophisticated, well-educated professional, thoroughly familiar with the workings of the industry.

In or about December, 1979, Triumph was conceived. Its gameplay theme was outerspace adventure. But, its distinctive element—the trade secret of this litigation—was its physical structure: a centrally-located, rotatable, computerized controller capable of producing private visual cues and public sound cues, rising from a landscaped gameboard (of which the controller was an integral part). The central computer, a microprocessor, was capable of storing information secret from the players as well as keeping track of the gameplay and influencing the future course of gameplay events. This configuration would allow two to four players to sit around the game-board (in precisely the manner to which devotees of traditional board games had long been accustomed), serially inputting and receiving information that would be unknown to the other participants.

To present their invention most advantageously, the plaintiffs constructed a demonstration model roughly approximating a market-ready game. Coleman's wife, a technical illustrator, created the prototype for a round, sectored, landscaped gameboard. The inventors also added a number of thematic accessories, including playing pieces and various game cards, all reflecting the exospherical motif.

To house the computerized controller in the center of the board, the plaintiffs used the coincidentally centrally located squat, black plastic dome from a game called "Laser Attack." Laser Attack, itself an MB product, involved no electronics. After removing the spinner and flashlight from inside the dome, the plaintiffs inserted the Triumph electronics and modified the dome's base so that the whole structure rose above its platform on the board and was capable of rotation. They further altered the plastic unit to add a membrane keyboard, which players would use to input information, and a light-emitting diode which would produce digital display readouts.

The plaintiffs spent from late 1979 through the end of February, 1980 polishing and perfecting Triumph. Coleman estimated that during this period he worked approximately 300 hours on the project, most of which was devoted to debugging the software. Burten contributed an additional 200 hours.

Back at MB, in approximately the same time frame but beginning a few months earlier, one Vince Erato (soon to become the villain of the piece) was grappling unsuccessfully with the challenge of combining the attributes of a traditional board game with those of computer technology to create an electronic board game. MB per-

---

**2.** Relatively unsophisticated precursors of such a hybrid included "Electronic Battleship" and "Codename Sector." But, these were little more than oversized versions of the hand-held gecgaws.

sonnel were under great pressure to introduce such an item. A senior product designer in MB's creative design department,[3] Erato began his work on the project in the summer of 1979, playing games on an Apple computer. He was particularly intrigued by one called "Wilderness Campaign," a solitaire fantasy/adventure game with a medieval theme, and he spent large blocks of time playing it. By September of 1979, Erato claimed, his ideas had become more focused, and he allegedly began logging time on the project that became Dark Tower. He drew the theme and the gameplay elements directly from Wilderness Campaign, transforming them only cosmetically. But, the physical form that the game would assume still eluded him.

What then transpired is, at the least, subject to conflicting interpretations. Erato's story is as follows. He knew that he wanted a set-up that could convey visual information, including displays of graphics. He first considered creating a "live" flat board. The piece de resistance of this endeavor was to be a round or rectangular box-like unit, with all the mechanicals and the microprocessor concealed inside and beneath the playing surface. A changing series of images would flash on the board through the combination of a rotating disc (inlaid with slides) and a programmed microprocessor. Next, he considered a horizontal cylinder with a rotating internal cylinder. Finally, according to Erato's recital of the script, by Christmas of 1979 he had explored yet a third alternative and had settled on the basic physical form which the market model of Dark Tower would take—a form highly suggestive of the February, 1980 version of Triumph. But, Erato's testimony was neither conclusive nor compelling.

John Vernon, Erato's superior and the director of creative design for MB, explained at trial that company policy required all the in-house inventors to keep contemporaneous, detailed, written records of the ideas which they generated. In special notebooks supplied by the company, the inventors were supposed to enter any novel elements of their game ideas, and to date and number each entry. The purpose of the journals was to document that a concept was developed internally in advance of any outside submission of a similar idea. Thus, the notebooks could protect the company from ill-founded claims of misappropriation made by independent inventors (or indeed, from charges of unfair competition by rival manufacturers).

Despite these directives, the supervisors at MB, or at least Vernon, seem to have taken an extraordinarily casual attitude toward the workbook rules. Consequently, Erato's notebook contained a paucity of entries; and among these, not a single reference to Dark Tower or to the centrally located, rotatable, computerized controller. Neither MB nor Erato himself produced any convictional documentation to support the claim that by late 1979/early 1980 he had conceived the physical design for Dark Tower. The tangible evidence presented at trial, together with what was not presented, e.g., the utter absence of any authenticated early-stage drawings or work papers, the lack of any mention of Dark Tower in MB's in-house survey and assessment meeting of March 20, 1980, cast charcoal shadows of doubt over MB's description of the process of parturition which it sought to ascribe to Dark Tower. And, given Erato's rather dismal performance on the witness stand, the jury was certainly at liberty to find that Erato had wholly failed to bring the crux of the plaintiffs' innovation independently to foal. This lack of support was a crucial element in the plaintiffs' case in light of the events that transpired in February, 1980 and the months that followed.

The interests of orderliness require that the court at this juncture backtrack momentarily.

---

**3.** Some of the persons who worked for MB at the times material to this case have since changed positions or left MB's employ. Erato is one of them. In the interest of simplicity, however, all MB employees are described as occupying the positions that they held in and about February 1980.

MB's general policy was to consider submissions from unaffiliated inventors known to the company. Apparently, the company's usual practice was to review only the work of inventors whose names were on the MB approved list. Although the plaintiffs were not on that roster, the defendant was familiar with Coleman (its ex-employee) and to a lesser extent with Burten, and was quite willing to consider their ideas.

It should also be noted that the defendant had established a three-tiered scheme for the assessment of outside submissions. If a suggestion survived initial presentment, it was retained and thereafter evaluated in depth. If the results of this investigation were favorable, it would be examined at a divisional level. Products which survived such scrutiny were then presented for appraisal by a blue-ribbon panel of MB's best and brightest at a so-called presidential review session. It was only on this plane that corporate acceptance of an idea could occur. Less than five percent of the off-shore concepts accepted by MB for marketing review worked their way up the ladder to the presidential rung.

In or about December of 1979, Burten contacted Vernon at MB and told him, essentially, that the plaintiffs were working on an electronic board game and asked if MB would be interested. Vernon replied affirmatively; he also told Burten that MB did not have any electronic board games. A meeting was arranged. No one at MB so much as hinted that there might have been a similar game in the works. And,

the jury could rationally have found that the defendant was nowhere in its search for such a product. The date for this preplanned session was rescheduled several times. Finally, on February 28, 1980, the plaintiffs brought their demonstration model of Triumph to the MB plant in East Longmeadow, Massachusetts.

James Walsh, director of product management for MB, met Coleman and Burten in the reception area and escorted them to the research and development wing. While Walsh assembled the other reviewers (Michael Gray, a senior product designer; Jeffrey Chambers, the supervisor of MB's creative design department; and James Houlihan, vice president for research and development), the plaintiffs set up the game in a conference room.

After a brief exchange of pleasantries, and before the demonstration of Triumph, the plaintiffs were given MB's wonted disclosure record form, and they signed it. There was no discussion of the form: no questions were asked by Coleman or Burten, and no explanations were offered by the MB personnel. There was never any claim that the plaintiffs were unable to read or prevented from reading the instrument. And, testimony indicated that such forms were routine in the industry. Advance execution of such a document was alien neither to Burten nor to Coleman.

Because of the critical significance of the disclosure agreement, it is reproduced in its entirety below.

### DISCLOSURE RECORD

#### Milton Bradley Company, Divisions and Subsidiaries

Gentlemen:

I wish to submit for your consideration, subject to all of the conditions below, the idea or item hereinafter described. I am the sole and exclusive owner (or the authorized representative of *Micro Pro Associates & Rainy Day Games* the owner) of said item or idea and am of legal age and free to make agreements relative to this idea or item.

#### Description of My Idea or Item

(Use attachments if necessary for fuller description. Accompany by photo or drawing. If your item or idea is patented, you may furnish us a copy of the patent since it defines your rights in the subject matter thereof.)

*"Triumph"  electronic  board  game*

I submit my idea or item voluntarily and I understand that this submission by me and its acceptance by Company does not, in whole or in part. establish or create by implication or otherwise any relationship between Company and me not expressed herein. I further understand and agree that Company, in its own judgment. may accept or reject the idea or item submitted and shall not be obligated to me in any way with respect to my idea or item until Company shall at its own election enter into a properly executed written agreement with me and then only, according to all of the terms of said agreement. If no agreement is concluded, I shall rely solely upon such rights as I may have under U.S. Patent laws.

I agree that Company may consider this idea or item within a reasonable time.

I further agree that Company may photograph, xerograph or otherwise reproduce for its records only any material submitted by me herewith or subsequently with respect to said idea or item whether accepted or rejected.

Date of Submission  *2/28/80*  Signature  *Allen K. Coleman*

Address  *134 Briarwood Dr, Manchester, CT. 06040*

Disclosed to _____  Date _____

Disposition of Idea  *TRIUMPH electronic board game*
*Hold for further evaluation*

---

Following the presentation, the plaintiffs agreed to leave their brainchild at the defendant's offices for further evaluation. MB employees performed a cost analysis and a marketing study. The preliminary soundings were auspicious. The game eventually reached the lofty level of presidential review—the last rung of the acceptance ladder. But, it did not survive in this rarefied atmosphere; on March 20, 1980, citing the game's high potential production cost and relative complexity, MB declared that Triumph could not triumph commercially, and consigned it to the scrap heap.

Much of the evidence at trial concerned the issue of where Triumph was kept while it was at MB and who, therefore, saw or could have seen the model at any point during that time. The parties exhaustively detailed the relative locations and proximity of the frequently assembled game and the offices and hangouts of each and every MB employee involved in the development and design of Dark Tower. The particulars are not of real consequence; given the *deMars* standard, it suffices to say that the game was not kept hidden, and it was readily accessible during much of the three week period to Erato as well as to other MB employees involved in the Dark Tower project. The means and the opportunity for misappropriation were palpably present.

After MB's rejection of Triumph, the plaintiffs modified the game, resubmitted the new version in vain to MB in April of 1980,[4] and submitted various prototypes to

**4.** Another disclosure record form was executed on this occasion, and the renewed proffer was

a number of other manufacturers. None was interested in marketing the game. Prior to each and every presentation, the plaintiffs executed disclosure record forms similar to the one which they signed at MB in February, 1980.

For the balance of 1980 and through the beginning of 1981, at least as far as the plaintiffs were aware, Triumph was a dead letter. Then, in February, 1981 (ominous drum roll in background), Coleman and Burten, though not together, both attended the annual, two-week Toy Fair in New York City. The event was the site of MB's first public display of Dark Tower. An entire inner room of the MB exhibit was devoted to this achievement. It was, after all, the first truly integrated electronic board game on the market.

Coleman, innocent of any knowledge of Dark Tower, had arranged with Chambers for a tour of MB's line. On spying Dark Tower, Coleman was surprised no little and quite some. He inquired how long the game had been in development. Chambers told him that MB had been working on it for less than one year.

Coincidentally, Burten and a companion also appeared at the Toy Fair to scrutinize MB's wares. They were met by Houlihan, who personally escorted them through the MB showrooms. Before they reached the Dark Tower exhibit, Houlihan suggested that Burten would find some elements of the new game "familiar."

Dark Tower had a medieval adventure motif, complete with warriors and brigands. But, neither theme nor gameplay are as salient to this case as its physical structure. The game featured a centrally-located, rotatable, black plastic tower, housing a computerized controller which rose from a landscaped gameboard of which it was an integral part, and which was capable of producing private visual cues and public sound cues. The central computer was capable of storing information secret from the players and of keeping track of gameplay. It possessed the ability to influence future gameplay as well. The central unit included a membrane keyboard and a light-emitting diode. Dark Tower, in these respects, bore a strong family resemblance to Triumph.

Meeting fortuitously at Toy Fair after each had seen MB's new offering, Coleman and Burten were of a single mind; each believed that MB had stolen their idea and used it in the genesis of Dark Tower. The plaintiffs lost little time in arranging a meeting with representatives of MB, including Millens Taft, senior vice president of research and development, to discuss their suspicions. Unable to effect a satisfactory resolution through this or any subsequent dialogue, they sought resort to the courts. No royalty or other remuneration was paid to them by the defendant. MB proceeded, betimes, to bring Dark Tower to market; and the game enjoyed enormous commercial success. Triumph lingered on the plaintiffs' shelf, gathering dust instead of profits.

The evidence at trial established the existence of an industry-wide custom among reputable game and toy companies to maintain the secrecy of ideas submitted by outside inventors and to use innovations only if royalties were paid to the inventor. The evidence further showed that not only did MB adhere to this custom, but it fostered such an understanding with outside inventors. High-level MB executives testified that the industry, as well as virtually all the independent professionals, shared this expectation. There was no evidence, however, that any representative from MB ever discussed this usage with the plaintiffs. Nor was the subject raised in February, 1980, when the plaintiffs signed the disclosure form. Indeed, neither plaintiff actually testified that he held this expectation at the time he signed the agreement.

The jury could certainly have found, on this record, that Erato, acting in the defendant's behoof, had come up dry. Recognizing perhaps that imitation is the ulti-

rejected immediately, without ado. Since the resubmission adds nothing of significance to the case, the court will focus upon the earlier disclosure for purposes of this rescript.

mate tribute which intellectual aridity pays to creative genius, he cribbed the plaintiffs' concept and built Dark Tower around it.[5]

### B. Travel

The plaintiffs' amended complaint contained four counts. Count I alleged fraud and deceit; count III was a breach of contract claim. At the close of their evidence, the plaintiffs withdrew the fraud count and the court ordered it discontinued with prejudice. Pursuant to a motion filed at that same time by the defendant, the court directed a verdict for MB on the contract count.

Following the presentation of its own case, MB renewed its motion for a directed verdict on the remaining claims, both sounding in tort. Count II asserted a claim for unfair competition/common law misappropriation of a trade secret. Count IV was a statutory claim of trade secret misappropriation pursuant to Mass.Gen.Laws Ann. ch. 93, § 42.[6] The court reserved decision on that motion, procedurally paving the way for its potential revivification as a motion for judgment notwithstanding the verdict. *See* Fed.R.Civ.P. 50(b).

The jury returned a general verdict for the plaintiffs in the sum of $737,058.10. The amount of the award was the jury's calculation of a reasonable royalty based on the Dark Tower profits as stipulated by the parties. The court ordered the clerk to enter judgment for the plaintiffs on both counts II and IV. The parties subsequent-

ly, and in a timely fashion, filed the various motions denominated *ante.*

### II.

Although the defendant's motions technically target two separate counts, the theories of liability are closely related; and, for purposes of judgment n.o.v., the statutory and common law statements of claim are susceptible to unitary consideration. Mass. Gen.Laws Ann. ch. 93, § 42 in essence codifies the Massachusetts common law elements of civil liability for misappropriation of trade secrets. *See generally Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 166 n. 8, 385 N.E.2d 1349, 1354 n. 8 (1979) (*Jet Spray II*) (suggesting that application of the statute would not affect liability, but only damages).

In *J.T. Healy & Son v. James A. Murphy & Son,* 357 Mass. 728, 260 N.E.2d 723 (1970), the court endorsed the Restatement definition of trade secret:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates

---

**5.** In fairness, the court notes that the evidence did not create the impression that MB's hierarchy acted wilfully or intentionally. With one exception, the MB personnel who testified seemed genuinely to believe, although perhaps for dubious reasons, that the company had not appropriated the plaintiffs' trade secret. The sole exception, however, was Erato—and he was the major force in MB's development of Dark Tower. Erato was not a credible witness, and single-handedly, in the court's view, undermined MB's defense.

**6.** Mass.Gen.Laws Ann. ch. 93, § 42 states in its entirety:

Whoever embezzles, steals or unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to

his own use, any trade secret, regardless of value, shall be liable in tort to such person or corporation for all damages resulting therefrom. Whether or not the case is tried by a jury, the court, in its discretion, may increase the damages up to double the amount found. The term "trade secret" as used in this section shall have the same meaning as is set forth in section thirty of chapter two hundred and sixty-six.

Mass.Gen.Laws Ann. ch. 266, § 30 provides: The term "trade secret" as used in this paragraph means and includes anything tangible which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production, or management information, design, process, procedure, formula, invention or improvement.

to the production of goods, as, for example, a machine or formula for the production of an article.   * * *   The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret."

*Id.* at 736, 260 N.E.2d at 729 (quoting Restatement of Torts § 757 comment b).  *See also Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 282 N.E.2d 921 (1972) (*Jet Spray I*);  Schneider & Halstrom, *Trade Secret Protection in Massachusetts*, 56 Mass.L.Q. 239, 243–44 (1971).  In adopting the Restatement definition, Massachusetts has allied itself with the majority view.  R. Milgrim, *Trade Secrets* § 2.01 (1977); Hutter, *Trade Secret Misappropriation: A Lawyer's Practical Approach to the Caselaw*, 1 W.New Eng.L.Rev. 1, 10 (1978) (hereinafter *Trade Secret Misappropriation*).

It is true that the statutory definition of the term does not precisely track the formulation so elucidated by the Massachusetts Supreme Judicial Court.  The differences are, however, fribbling.  And, in the case at bar, any semantic disparity between the statutes and the caselaw is of no consequence.   The parties tacitly agreed throughout that the question of whether the plaintiffs' game design was a trade secret *vel non* required an identic answer irrespective of which of these yardsticks was employed.   They expressly ratified this approach at the conclusion of the evidence, when they stipulated to the submission of the case to the jury on the common law claims alone, authorizing the court subsequently to enter judgment on the statutory count in accordance with the jury's verdict on the common law count.  They cannot now renounce this agreement, *cf. Cipriano v. Rhode Island*, 738 F.2d 535 at 537 (1st Cir.1984);  nor have they attempted in their post-trial briefs to do so.  The court's analysis and holding on the liability

issue must, perforce, apply with equal impact to both remaining counts.

### III.

The standard of review on the defendant's motion for judgment notwithstanding the verdict is, as noted above, the same as the standard for decision on a motion for a directed verdict.   Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiffs, MB can prevail if and only if, as a matter of law, but a single conclusion can be drawn. *Jordan v. United States Lines*, 738 F.2d 48 at 49 (1st Cir.1984);  *Curreri v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers*, 722 F.2d 6, 8 (1st Cir.1983);  *Robinson v. Watts Detective Agency*, 685 F.2d 729, 733 (1st Cir.1982);  *deMars v. Equitable Life Assurance Society*, 610 F.2d at 57.   Having heard all the testimony and reviewed all the exhibits, the court is convinced that the applicable standard leaves only a single issue which need detain the court for long: the legal effect of the disclosure form.[7]

MB views the form as an impregnable shield;  it urges that, as a matter of law, the execution of an agreement disclaiming the creation of any relationship between the parties and limiting the disclosers to their rights under the patent laws absolutely precludes, in the first instance, the establishment of a confidential relationship, and ultimately interdicts any action for misappropriation.   Because its form constitutes such an agreement, MB's thesis runs, it cannot be liable to these plaintiffs in the circumstances of this case.

The plaintiffs concede that Triumph's ingredients, howsoever ingenious, do not rise to the level of patentability;  and they admit that the defendant's legal theory would be valid in certain situations.   But, they argue that the proposition is not apposite here.   In response to the array of authorities mustered by MB, Coleman and Burten

---

7.   The defendant's arguments that it is entitled to judgment because there was insufficient evidence of copying and inadequate proof that the plaintiffs' idea was novel are hereby rejected.

Although not overwhelming, there was credible evidence on both questions from which the jury could reasonably have found for the plaintiffs.

note that in none of the cases relied upon by the defendant did the disclosee encourage an understanding between the parties that was contrary to the language of the waiver. In this case, the plaintiffs state, the evidence showed that high-ranking executives of MB—including Houlihan, who was present when the form was signed—themselves held and fostered the expectation that MB would, in consideration for disclosure, maintain the fruits of creative thought in the bosom of the lodge and use only ideas for which it paid.

If the factors cited by the plaintiffs suffice to mitigate the express language [8] and stated intent of the agreement, then the jury's verdict must stand, inasmuch as the court is persuaded that in all other respects the evidence was sufficient. The converse is equally true: if the disclosure record form is given effect according to its tenor, then MB is entitled to judgment as a matter of law. The resolution of this deceptively intricate tangram depends on the law of trade secrets. And, since the precise question is one of novel impression in terms of Massachusetts law,

> [i]t is this court's task to vaticinate what the decision of the [Massachusetts] Supreme [Judicial] Court would be were that court faced with the issue. In undertaking this forecast, the court must look to relevant, i.e., analogous, state court decisions, and may assay sister state adjudications.

*Plummer v. Abbott Laboratories*, 568 F.Supp. 920, 921–22 (D.R.I.1983) (citations omitted).

The protection of trade secrets has a long history in Massachusetts. *Peabody v. Norfolk*, 98 Mass. 452 (1868), an early decision of the commonwealth's high court, "is frequently cited as the seminal case for much of the development of trade secrets law in the United States." *Trade Secret Misappropriation, supra,* at 7. Strong public policy concerns underlie the safe-

guarding of trade secrets. Specifically, protection is thought to encourage invention and development, *Jet Spray II,* 377 Mass. at 167, 385 N.E.2d at 1355, as well as to nurture the "maintenance of standards of commercial ethics." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481, 94 S.Ct. 1879, 1886, 40 L.Ed.2d 315 (1974). *See also Trade Secret Misappropriation, supra,* at 9.

■ The elements of a cause of action for misappropriation of a trade secret, a variant of the business tort of unfair competition, are at once simple to recite and complex to apply. Those jurisdictions which have recognized the action have required a substantially uniform specie of proof. To succeed, a plaintiff must show that he or she possessed a trade secret, that he or she disclosed that secret to the defendant, that the parties shared a confidential relationship, and that the defendant adopted and used the secret to the plaintiff's detriment. R. Milgrim, *Trade Secrets* § 7.07[1] (1983) (listing elements "culled from numerous trade secret cases").

Three of these four elements are now beyond dispute in this case, having been decided by the jury based on a plentitude of probative evidence. Burten and Coleman owned a trade secret which was incorporated in their version of Triumph, they disclosed it to MB, and MB used the proprietary material to enrich its corporate coffers without compensating the plaintiffs. Only the question of the existence of a confidential relationship remains; and this in turn depends on the effect of the disclosure agreement.

The issue is a difficult one for a number of reasons. It arises from a factual situation that is not common among the published decisions. Those courts that have addressed the issue have often had to confront it in a substrate of confused and overlapping causes of action, including tort, express and implied contract, and quasi-

---

**8.** The plaintiffs have urged that the language of the form is ambiguous as to the waiver of tort liability and thus, as a contract of adhesion, should be construed against MB. The court, however, fails to perceive any such ambiguity. The contentions of Coleman and Burten in this regard are woven of much cry and little wool.

contract or quantum merit. Not surprisingly, the analysis and reasoning of those decisions has often been imprecise and has seldom been illuminating. In addition, most of the relevant caselaw is relatively hoary.

But the lack of clear guidance, while nettlesome, is not the most troubling aspect of the matter at bar; this is a hard case because it presents a surpassingly close question. Coleman and Burten seem at first blush to have been wronged: the defendant used the plaintiffs' idea, profited handsomely, and eschewed compensation. And the defendant, a large and relatively unsympathetic corporation, simultaneously preyed upon and benefited from, on the one hand, a tacit understanding that it would hold the plaintiffs' submission secret, and would afford due compensation for its use; and on the second hand, from the insulation provided by its disclosure record form. The essence of that amalgam from the plaintiffs' viewpoint is that MB offers an ersatz carrot while clutching behind its corporate back an authentic stick: it leads inventors to believe that it will keep their suggestions private and use only ideas for which it pays, but requires the inventors to waive virtually all rights of action against MB, leaving them defenseless should MB decide to swing the club.

But, the equities are not so one-sided as the plaintiffs would have it appear. Ideas are the most intangible of property rights, and their lineage is uniquely difficult to trace. Paternity can be claimed in the most casual of ways, and once such a claim is lodged, definitive blood tests are notoriously lacking. If manufacturers such as MB could not effectively safeguard themselves against such forays, they might well have to curtail submissions from independent inventors. Such a result would be plainly detrimental to both sides—and to the consumer as well.

While these concerns lurk in the background, the focus of the court's inquiry must be on characterization of the interaction of these parties. As one leading commentator has noted, "[w]hen protection of

trade secrets is afforded by operation of law, the favorite judicial rubric upon which the decisional coat is hung is the existence of a confidential relationship." R. Milgrim, *supra*, § 4.03 at 4–12. A judge-made construct, the confidential relationship concept is a flexible one; "[d]efinition has been almost scrupulously avoided." *Id.* at 4–19. The courts "consider the factual circumstances of each case on an individual basis, to determine whether a confidential relationship may reasonably be implied." *Pachmayr Gun Works v. Olin Mathieson Chemical Corp.*, 502 F.2d 802, 808 (9th Cir.1974).

A range of affiliations have been found to give rise to the requisite intimacy. *See* R. Milgrim, *supra*, §§ 5.01–5.05. Examples include employee/employer, *e.g., Jet Spray I; E.I. duPont de Nemours & Co. v. American Potash & Chemical Corp.*, 41 Del.Ch. 533, 200 A.2d 428 (1964); purchaser/supplier, *e.g., Curtiss-Wright Corp. v. Edel Brown Tool & Die Co.*, 381 Mass. 1, 407 N.E.2d 319 (1980); independent contractor/manufacturer, *e.g., Nucor Corp. v. Tennessee Forging Steel Service*, 476 F.2d 386 (8th Cir.1973); and, the slot into which these parties fit, prospective licensee/licensor, *see* Annot., 9 A.L.R.3d 665 (1966) (collecting cases).

■ Absent the disclosure record form, the facts and circumstances of this case would suffice to give rise to a confidential relationship. *Cf. Trade Secret Misappropriation, supra*, at 24–25. The existence of the agreement, however, significantly alters the liability calculus. And, the authorities seem, overall, to tip the balance in the defendant's favor. While careful perscrutation of the details of the cases relied upon by MB indicates that the matter is not as cut and dried as the defendant would like this court to believe, the accepted judicial approach in roughly similar situations has been in line with the defendant's contentions.

Addressing the general effect of a disclaimer by the disclosee, one of the most influential of commentators on trade secret law stated:

[A] disclosure expressly received in confidence may create a confidential relationship. Conversely, express disclaimer by the disclosee of a confidential relationship from the outset will dispel the existence of such a relationship.

R. Milgrim, *supra,* § 4.03 at 4–18 (footnotes omitted).

There can be no question but that MB intended the form at issue here to disclaim a confidential relationship. Indeed, the very language of the instrument permits of no other conclusion. And, as Milgrim has more specifically explained:

> [w]hereas the courts might recognize the confidential relationship between a prospective licensor and licensee, an aspiring inventor cannot thrust the confidential relationship role upon another merely by submitting a patent application marked "confidential" to the latter. *Nor can disclosure of information, after the prospective licensee has carefully disclaimed a confidential relationship or any implied duty, be the basis for an action.*

*Id.* § 5.03[2] at 5–66 (footnotes omitted) (emphasis added).

Moreover, the record in the case negates any inference that the plaintiffs signed the form by coercion, under duress, or out of ignorance. Both Coleman and Burten were professional inventors; they knew the lay of the land. The MB form was signed on not one, but two, occasions. And, the seriatim submissions of Triumph to other game manufacturers which followed hot on the heels of the final MB rejection were each accompanied by the execution of a like disclaimer. The plaintiffs were plainly aware, whatever their view of industry custom and practice, that no prospective licensee was willing to bind itself in advance to pay the piper if it liked the tune.

Prior caselaw on this issue, at best old and somewhat scarce, offers indistinct guideposts rather than clear instruction, primarily because most of the decisions can, in one way or another, be distinguished from the case at bar. The extent to which these distinctions make a differ-

ence will be analyzed *post;* but it is of critical importance that there is no reported decision, distinguishable or not, which directly supports the plaintiffs' position. In any event, a review of the pertinent decisions is plainly in order.

MB identified *Hisel v. Chrysler Corp.,* 94 F.Supp. 996 (W.D.Mo.1951), as the capstone of its defense. The plaintiff in *Hisel* claimed that he had "in faith and confidence" divulged a novel idea to the defendants and, in breach of that confidence, the defendants had used the fruits of his esemplastic power without compensating him. *Id.* at 1001. Responding by letter to the plaintiff's invitation to consider his undisclosed idea, Chrysler Corporation had called the plaintiff's attention to the company's policy anent the review of outside proposals. Enclosed with the letter was an outline of the policy as well as a form prepared by the company; the plaintiff was instructed to fill out and return the latter with his idea. *Id.* at 998–99. He sent the company his suggestion about one year later, but did not return the signed form until some two weeks thereafter (subsequent to receiving a reminder letter from Chrysler). Following a brief description of the idea, inserted by the plaintiff, and above the plaintiff's signature, the form provided:

> "I have been informed by your representatives that you are willing to consider all suggestions which may be made to you by persons outside of your Corporation, but that because of the large number of such suggestions, containing both old and new ideas, which are submitted from people in all walks of life and of every temperament and disposition, you require the acceptance by me of certain conditions before considering my suggestion. These conditions are:
>
> "1. Chrysler Corporation is willing to consider any suggestion which may be made but does so only at the request of the person who has the suggestion.
>
> "2. No obligation of any kind is assumed by, nor may be implied against, the Chrysler Corporation, unless or until

a formal written contract has been entered into, and then the obligation shall be only such as is expressed in the formal written contract.

"3. I do not hereby give Chrysler Corporation any rights under any patents I now have or may later obtain covering my suggestion but I do hereby, in consideration of its examining my suggestion, release it from any liability in connection with my suggestion or liability because of use of any portion thereof, except such liability as may accrue under valid patents now or hereafter issued.

"I am agreeable to these conditions and ask you to consider my suggestion under them."

*Id.* at 999. Chrysler rejected the plaintiff's plan shortly thereafter. Hisel eventually filed suit, once he had concluded that Chrysler had nonetheless used his submission. The defendants moved for summary judgment.

Emphasizing that the plaintiff had been "fully informed" of the company's policy and that the form specifically released Chrysler from all liability except that arising from patent rights, the court held that, as a matter of law, the "clear intent, manifest in the ... agreement, [was] repugnant to any implication of confidential relationship existing between plaintiff and Chrysler Corporation." *Id.* at 1001–02. Having found that the parties dealt with each other at arm's length, the court explained that

[u]nder the facts shown in evidence, the law will not ... cast a liability on [Chrysler Corporation] by implication of a confidential relationship such as we would be compelled to do to sustain a right of action existing in favor of plaintiff. Even though defendants may be shown to be making use of plaintiff's claimed idea, "they are not indebted to plaintiff because they did not offer (or) make any agreement to pay for such (idea)" if they used it, unless it was patentable.

*Id.* at 1002 (quoting *Lueddecke v. Chevrolet Motor Co.,* 70 F.2d 345, 348 (8th Cir. 1934)).

The *Hisel* decision is arguably distinguishable from the instant case for a number of reasons. First, the *Hisel* court had two grounds, independent of the waiver form, upon which to bottom its grant of the defendants' motion. The defense asserted lack of novelty, and the plaintiff failed to controvert the affidavits and exhibits filed in support of the motion for summary judgment. Second, *Hisel* did not involve testimony from representatives of the disclosees that they held, and encouraged outside inventors to hold, an understanding of confidentiality and compensation for ideas used such as is present in the record sub judice. But, the Chrysler Corporation, in at least one of its documents, clearly acknowledged that it had "made use of and paid royalties for a large number of inventions which [had] been submitted to it by persons outside the Corporation," and that it gave "as much, if not more, consideration" to ideas from outside as to those from inside. *Id.* at 998. Fairly read, *Hisel* provides persuasive support for the position advanced by MB.

The *Hisel* court appears to have erred, however, in relying unconditionally on *Lueddecke v. Chevrolet Motor Co., supra;* and MB has repeated the error. *Lueddecke* did not involve a confidential relationship; the plaintiff's only theory of recovery was based on an alleged implied contract. 70 F.2d at 345. The court in *Lueddecke* rested its holding on the lack of any offer by the defendant to pay for the plaintiff's idea. *Id.* at 348–49. *Lueddecke* is thus largely inapposite to MB's asseveration.

*Kearns v. Ford Motor Co.,* 203 U.S.P.Q. 884 (E.D.Mich.1978), in which summary judgment was granted adverse to the plaintiff's claims for misappropriation of trade secrets and unjust enrichment, is properly ensconced in MB's armamentarium. The plaintiff in *Kearns,* a well-educated engineer and inventor, familiar with and experienced in the industry, alleged that the defendant had used, without recompense, ideas which he had disclosed to it in confidence. Having shown his invention to two company employees, the plaintiff was invit-

ed back to demonstrate the product to a larger group at the company. *Id.* at 886. At that time and subsequently, he signed a number of waiver forms, although he contended in the course of litigation that company representatives suggested certain inducements which were never forthcoming. *Id.* The confidential disclosure waivers provided as follows:

"The undersigned represents that he now has certain suggestions, inventions and/or ideas and may in the future have other suggestions, inventions, and/or ideas (hereinafter referred to as 'suggestions') and desires to interest the Ford Motor Company in the merits of such suggestions. The undersigned acknowledges that Ford Motor Company cannot receive suggestions in confidence and will consent to the disclosure thereof to its representatives only under the conditions set forth, and not otherwise.

"First: All rights and remedies of the undersigned (and principals, if any, of the undersigned) arising out of the disclosure of such suggestions to, or the use thereof by the Ford Motor Company or any of its representatives, shall be limited to any rights and remedies, as may now or in the future be accorded to the undersigned under United States Patents or Copyrights.

"Second: All other claims of any nature whatever arising out of any disclosure of the undersigned to Ford Motor Company are hereby waived."

*Id.*

The *Kearns* court explained that to determine the existence *vel non* of a confidential relationship, one must look "to the personal attributes of the parties and the nature of their dealings." *Id.* at 888. It then went on to find "incredible that on the basis of two contacts three days apart a person of plaintiff's extensive education, experience, and presumed sophistication formed with a mammoth, multi-national corporation a relationship of trust and confidence completely contrary to the plain language of a waiver he admits to having voluntarily signed." *Id.*

The parallels between the *Kearns* case and this one are clearly evident. Coleman and Burten were neither uneducated nor unsophisticated; both were wholly familiar with the game industry. Furthermore, they voluntarily and knowingly signed the disclosure agreement. It follows inexorably that the *Kearns* reasoning bulwarks MB's position.

*Van Rensselaer v. General Motors Corp.*, 223 F.Supp. 323 (E.D.Mich.1962), *aff'd*, 324 F.2d 354 (6th Cir.1963), provides at least oblique reinforcement for MB's defense. The case can be viewed as distinguishable because the language relied upon actually applied to the plaintiffs' quasi-contract claim. But, the *Van Rensselaer* court set out the requisite elements of that claim in a manner which replicates the elements of the tort claim proffered by Coleman and Burten in the instant case. *Id.* at 330–31. In responding to an inquiry from the *Van Rensselaer* plaintiffs, the General Motors Corporation had expressed in writing its willingness to review the plaintiffs' idea. In so doing, the defendant called attention to the company's relevant procedures, which were described in an enclosed pamphlet. The brochure specifically abjured the establishment of a confidential relationship and limited any future obligations of the defendant to those dictated by the patent laws. *Id.* at 325. The pamphlet further provided that the company would not consider unpatentable concepts. *Id.* at 325 n. 7. General Motors ultimately rejected the plaintiffs' ideas, finding nothing novel in them. *Id.* at 327. The court determined that the language of the company's disclaimer barred the establishment of a confidential relationship between the parties. *Id.* at 331.

Both *Telechron, Inc. v. Parissi*, 120 F.Supp. 235 (N.D.N.Y.1954), *aff'd*, 229 F.2d 440 (2d Cir.1956), and *Zaidan v. Borg-Warner Corp.*, 228 F.Supp. 669 (E.D.Pa.1964), *aff'd*, 341 F.2d 391 (3d Cir.1965), involved disclaimers which specifically disavowed confidential relationships. Although not a basis for its holding, the *Telechron* court ventured that the company's booklet, which

"in plain, precise language warn[ed] that the company cannot consider any idea or invention on the basis of a confidential relationship," presented a serious impediment to the establishment of such a tryst. 120 F.Supp. at 240. The court in *Zaidan* relied expressly on the disclosure record signed by the plaintiff, stating that it "negat[ed] the existence of any possible confidential relationship, thereby precluding liability as a matter of law." 228 F.Supp. at 671. The Borg-Warner form avowed that it was "particularly understood that no confidential relationship shall be deemed to exist between [the plaintiff] and [the corporation] because of [the plaintiff's] having made such disclosure." *Id.* at 669. Although the disclosure agreements in both cases were more meticulous than MB's form, both *Telechron* and *Zaidan* are in line with MB's analytic stance.

*Wanberg v. Ocean Spray Cranberries, Inc.*, 194 U.S.P.Q. 350 (N.D.Ill.1977) (applying Massachusetts law), is interesting, but not dispositive. *Wanberg* did not actually involve a claim for misappropriation of a trade secret. But, the *Wanberg* court apparently accepted the defendant's argument that "the gravamen of the complaint [was] misappropriation of an idea for which there are three elements necessary to state a cause of action: novelty, confidential disclosure and use." *Id.* at 351. The court determined that the release prepared and submitted by the plaintiff, which specifically limited him to patent and copyright claims, negated the existence of a confidential relationship and, thus, worked a surrender of the plaintiff's common law choses in action. *Id.* at 351–52.

**9.** Several other cases which MB has run up the flagpole fail to evoke any salutes. In *Crown Industries v. Kawneer Co.*, 335 F.Supp. 749 (N.D. Ill.1971), the very explicit disclosure form which the plaintiff signed was not even mentioned as a ground for the court's decision on the confidential relationship issue. The court relied on the plaintiff's failure to request the defendant to keep its idea secret and the fact that the relationship was not "of the type from which such a confidential relationship could be implied." *Id.* at 762. The form was, however, fatal to the plaintiff's implied-in-fact contract claim. *Id.*

*Irizarry y Puente v. President and Fellows of Harvard College*, 248 F.2d 799 (1st Cir.1957), *cert. denied*, 356 U.S. 947, 78 S.Ct. 785, 2 L.Ed.2d 822 (1958), falls far short of the mark at which the defendant has aimed. The plaintiff's disclosure in *Irizarry* was unsolicited and gratuitous and thus could not give root to a "fiduciary" relationship. *Id.* at 802. No disclosure release was before the court in *Irizarry*.[9]

The defendant spotlighted two cases by endeavoring to distinguish them. But, the plaintiffs could in any event draw precious little sustenance from the first of these, *Moore v. Ford Motor Co.*, 43 F.2d 685 (2d Cir.1930). The company's reply letter to the plaintiff in *Moore* simply advised him to send his idea and noted that "there would be no obligation on our part." *Id.* at 687. The court construed this language to mean not that the company had disclaimed all liability, but that the company was "merely without obligation to accept the plan or compensate the plaintiff for submitting it; it [did] not mean that defendant was freed from any obligation not to appropriate it without the plaintiff's consent." *Id.*

*Houser v. Snap-On Tools Corp.*, 202 F.Supp. 181 (D.Md.1962), provides perhaps a bit more encouragement to the plaintiffs. The claimant in *Houser* signed a disclosure form which provided in pertinent part:

"I have been informed by your representatives that you are willing to consider all suggestions which may be made to you for persons outside of your corporation but that you require the acceptance by me of certain conditions before considering my suggestion.

"These conditions are:

MB also insinuates that both the district court and Seventh Circuit opinions in *Boop v. Ford Motor Co.*, 177 F.Supp. 522 (S.D.Ind.1959), *aff'd*, 278 F.2d 197 (7th Cir.1960), promote its defense to this action. But, although the *Boop* litigation shared several similarities with the case before the court, a cause of action in tort was not among them. In three counts, the *Boop* plaintiff's complaint included claims in fraud and misrepresentation, breach of express or implied contract, and wrongful conversion. 278 F.2d at 197–98; 177 F.Supp. at 524–25. MB's reliance on *Boop* is misplaced.

"1. Your firm is willing to consider any suggestions which may be made but does so only at the request of the undersigned who has the suggestion.

"2. No obligation of any kind is assumed by, nor may be implied against your firm unless or until a formal written contract has been entered into and then the obligation shall be only such as is expressed in the formal written contract.

"3. This preliminary disclosure arrangement in no way extends to nor affects the rights provided under the patent laws of the United States except as such may be embodied in a formal written contract between the parties.

*Id.* at 183 n. 1. The defendant claimed that the form constituted "a waiver of any confidential relation and all rights based thereon." *Id.* at 184. The court disagreed. Finding the language "far from ... clear and unambiguous," it stated:

[w]ithout determining the effect of this so-called waiver, it is doubted that a document such as this would give a manufacturer the right to expropriate a disclosure without remuneration where the course of dealings between the parties indicates, as it does here, that the disclosing party was seeking remuneration for the use of his creation.

*Id.*

Thus, in dicta, both *Moore* and *Houser* cast some doubt on the efficacy of the MB release form. Yet, neither case involved an out-and-out documentary disclaimer of the existence of any relationship of trust and confidence. And, although the MB disclosure record form is not as explicit as it could be, *compare, e.g., Kearns*, 203 U.S. P.Q. at 886, it is neither ambiguous nor uncertain. It disavows the creation of "any relationship" between the parties, relieves the company of any obligation not expressed in a subsequent written agreement, and, absent such, limits the plaintiffs to their rights (if any) under the patent laws. These unequivocal terms are, in the circumstances of this case, controlling.

When all is said and done, Coleman and Burten took a calculated businessperson's risk. They knew that MB would not deign to inspect their invention without benefit of its standard disclosure release; and they knew, as well, that the defendant had a track record of rewarding deserving inventors irrespective of its legal obligations to do so. They knowingly signed away the bulk of their rights, in the hope and expectation that MB would, if it found their idea appealing, honor their contribution whether or not it was legally required to pay royalties. In so doing, the plaintiffs committed their cause to MB's discretion, and placed their prospects of remuneration largely in the hands of the manufacturer. Having been disappointed after the fact, Coleman and Burten cannot now be heard to complain that the defendant has been unfair in its insistence upon literal adherence to the terms of the agreement. After all, "one may not venture on liberties with his own secret, may not lightly or voluntarily hazard its leakage or escape, and at the same time hold others to be completely obligated to observe it." *Gallowhur Chemical Corp. v. Schwerdle*, 37 N.J.Super. 385, 397, 117 A.2d 416, 423, (1955), *quoted with approval in J.T. Healy & Son*, 357 Mass. at 738, 260 N.E.2d at 730.

▮ It is settled law in Massachusetts that the voluntary transmittal of an idea without limitation upon use permits appropriation, and carries with such appropriation no concomitant onus of obligation. *Irizarry*, 248 F.2d at 802–03; *Wanberg*, 194 U.S.P.Q. at 352; *Bowen v. Yankee Network*, 46 F.Supp. 62, 63 (D.Mass.1942). It follows inexorably that such a submission, made upon express limitations, in the absence of fraud or further agreement of the parties, is protected only to the extent of those limitations. Here, the plaintiffs have conceded that no fraud was practiced by MB. The arrangement which they entered into with the defendant was undertaken at arm's length and with eyes wide open. There is no basis in the record for any claim of novation or of contract modification. Their claims are delimited by that agreement, not by their recital of more grandiose expectations. And, given the frail prophylaxsis of the disclosure form, MB was not duty bound, under Massachu-

setts law, to make reparations for use in this instance.

This result is particularly compelling in view of the plaintiffs' invocation of diversity jurisdiction, 28 U.S.C. § 1332, in the case at bar. "In such a situation, a federal court must take state law as it exists: not as it might conceivably be some day; nor even as it should be." *Plummer*, 568 F.Supp. at 927. *Accord Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690 at 694 (1st Cir.1984). Although Massachusetts authority squarely on point is lacking, the caselaw generally is implacably opposed to the plaintiffs' attempt to skirt their express disclaimer of a *sotto voce* relationship. Nor has Massachusetts, either legislatively or judicially, signalled any intention to effectuate some radical departure in this area. Under such circumstances, there is "no basis for applying any rule other than the traditional one." *Dayton*, at 694–695 (footnote omitted).

There remains, withal, a persistent hint of inequity. MB's methodology may well be seen as an insidious form of gameplay, constructed to trap the unwary; but it is equally consistent with the belt-and-suspenders approach of a commercial enterprise determined to protect its flanks in all events. The choice between these conflicting interpretations of the defendant's motives is not, however, a legally significant one. Short of fraud or specific statutory prohibitions, the marketplace is the best, indeed the only, arbiter of such practices: if MB is to thrive and prosper in a competitive environment where ideas are the currency of success, it must deal honorably with the inventor community—and it must be perceived by that community as dealing from the top of an unmarked deck. If MB has treated with the plaintiffs unfairly, its just desserts will follow in the form of inability effectively to solicit outside innovations, and the resultant loss of opportunities and revenues.

In the last analysis, it should be noted that life itself is often unfair; and volitional agreements need not be perfectly balanced to have legal force and effect. Coleman and Burten made their bed when they eagerly affixed their signatures to the disclosure record form in order to induce MB to look at their wares; they cannot now sleep elsewhere. Viewed in that perspective, this litigation stands as a pointed example of the truism that "one who claims that he has a trade secret must exercise eternal vigilance" to safeguard it. *J.T. Healy & Son*, 357 Mass. at 738, 260 N.E.2d at 731.

The court concludes, therefore, that Massachusetts would follow the virtually unbroken skein of authority elsewhere, and that, consistent with prior caselaw in the commonwealth and in sister states, the plaintiffs have, on this record, established no valid claim for misappropriation of trade secrets sufficient to warrant jury consideration. Given the agreement, MB's motion for judgment n.o.v. must be granted as to both count II and count IV of the amended complaint.

IV.

In accordance with the mandate of Fed.R.Civ.P. 50(c)(1), this court must, having granted judgment n.o.v., rule conditionally on MB's alternative motion for a new trial. A new trial should be granted "if the trial court is convinced that the verdict is against the weight of the evidence and that a miscarriage of justice would otherwise obtain." *Austin v. Unarco Industries*, 705 F.2d 1, 17 (1st Cir.1983); *Valm v. Hercules Fish Products*, 701 F.2d 235, 237 (1st Cir.1983). But for the legal effect of the disclosure agreement, the jury's verdict is entirely supportable. If the execution of the form does not bar Coleman and Burten from recourse for the defendant's use of their idea as a matter of law, this court has no qualms in endorsing the verdict as a matter of fact. Given the full panoply of events as reflected by the testimony and by the exhibits, and the fair inferences to be drawn therefrom, the jury was amply warranted in finding for the plaintiffs on the liability issues as framed by the court's charge (which, in order to spare the necessity for a retrial, posited the effect of the release largely as a question of fact). Such a finding was consistent with the weight of the trial evidence and flowed rationally from the factual panorama.

The reasons underlying this conclusion are adequately documented *ante.* Succinctly put, the jury had evidence before it that the plaintiffs' approach was a novel one, that they were the instrument of MB's enlightenment as to the concept, and that they expected MB to honor both their revelations and their proprietary interest. Most salient, the jury could well have inferred, from such things as Erato's demeanor, the paucity of records to document MB's in-house work, and the timing of Dark Tower's journey to market, that MB plagiarized the plaintiffs' idea without so much as a by-your-leave. Any more searching analysis of the trial record would serve only to paint the lily. It suffices to say at this juncture that, if a higher tribunal should hereafter declare that the case was properly entrusted to the tender ministrations of the finders of the facts, then no miscarriage of justice would result from the imposition of liability. And, the size of the compensatory damage award is plainly responsive to the evidence of putative royalties.[10]

The alternative motion for a new trial is, therefore, denied.

### V.

The court's disposition of the defendant's post-trial motions renders it unnecessary to consider either of the plaintiffs' post-trial motions. While it is true that an argument can be made, based upon the presumed spirit and intent of Fed.R.Civ.P. 50(c)(1), for deciding the latter motions on a conditional basis presently (so as to permit immediate appellate review of all points at issue), Rule 50(c)(1) itself is not so elastic. Any attempt to attentuate the rule beyond its express imperatives would stretch considerations of judicial economy to an illogical extreme. The reasoning of *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940), and its progeny, upon which Rule 50(c) is grounded, *see* Fed.R.Civ.P. 50(c) advisory committee note, stops far short of such a result.

In light of the granting of MB's motion for judgment notwithstanding the verdict, the issues raised by the plaintiffs as to their entitlement to prejudgment interest and to a doubling of damages are, at the moment, of academic interest only. There is no rhyme or reason sufficient to justify the court in plunging headlong into these maelstroms in the absence of a meaningful, zoetic controversy. The odds are that, in the long run, precious judicial resources would be wasted rather than conserved were the court to chart a more aggressive course.

### VI.

For the reasons set forth above, the defendant's motion for judgment n.o.v. is granted; the defendant's alternative motion for a new trial is denied; and the plaintiffs' twin post-trial motions are each passed *sine die.*

*It is so ordered.*

---

**10.** Indeed, the defendant, in its post-trial motions, has not attacked the verdict amount as being excessive, speculative, induced by passion, or otherwise infirm.