Myrel **MOORE** and Sondra Moore, Plaintiffs,

v.

**MARTY GILMAN, INC.** d/b/a Gilman Gear, and Neil Gilman, Defendants.

Civil Action No. 91–13354–RCL.

United States District Court, D. Massachusetts.

May 15, 1997.

Douglas H. Meal, Kevin J. O'Connor, Ropes & Gray, Boston, MA, for Myrel Moore and Sondra Moore.

Arthur Z. Bookstein, Boston, MA, Peter Schechter, Darby & Darby, New York City, Donald R. Steinberg, Hale & Dorr, Boston, MA, Harold W. Potter, Jr., Dianne R. Phillips, Sherburne, Powers & Needham, Boston, MA, for Neil Gilman and Marty Gilman, Inc.

Neil Gilman, Gilman, CT, pro se.

YOUNG, District Judge.

### REPORT AND RECOMMENDATION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT (DOCKET NOS. 82 AND 86)

#### October 7, 1996

KAROL, United States Magistrate Judge.

### I. Introduction

Football is a contact sport, but no more so, apparently, than the business of marketing football training equipment, if this case is any indication.

Plaintiff Myrel Moore ("Coach Moore") was a professional football coach. In the early 1970s, while he was a special teams coach for the Denver Broncos, he observed a practice drill in which another coach would roll a large foam ball toward the knees of a defensive player, to simulate an opponent's block and to improve the player's ability to fend it off. Coach Moore was impressed with the drill. Intermittently over the next two decades, he and his wife, co-plaintiff Sondra Moore, worked with consultants to develop a large foam ball of their own. Plaintiffs called their product the "C.A.T. Ball," the initials standing for "Conditioning–Agility–Technique." Coach Moore freely used several versions of the C.A.T. Ball in public, and he and others promoted its use to countless coaches and players through demonstrations, word-of-mouth advertising, videotapes, magazine articles, and product literature. Players and coaches who saw and used it often acknowledged its potential usefulness as a training device. A mass market never developed, however, largely because neither the Moores nor the consultants from whom they sought technical advice could devise a method of construction which would make the C.A.T. Ball sufficiently resistant to cracking and splitting to withstand the punishment inflicted on it by football players.

In mid–1991, Coach Moore sought out defendants—manufacturers and marketers of their own line of sporting equipment—and asked for their help in solving these long-standing problems. Within weeks, defendants, using their own funds and technical expertise, but with some marketing advice provided by Coach Moore, had devised a process for manufacturing a durable and otherwise improved ball. Unfortunately, however, the parties could not agree on an allocation of the anticipated fruits of defendants' labor. Negotiations regarding a possible joint venture soon broke down, and defendants began selling the improved ball on their own, under the trade name the "Shiver Ball." The Moores promptly filed this lawsuit, alleging, among other things, misappropriation of trade secrets, breach of express and implied contract, fraud, and unfair trade practices. Defendants counterclaimed asserting, among other things, misrepresentation and unfair trade practices. Following the close of discovery the parties filed cross motions for summary judgment with respect to each other's affirmative claims. For reasons stated below, I recommend that defendants' motion be **GRANTED** on all plaintiffs'

claims other than unjust enrichment and violation (in one narrow respect) of Mass.Gen.L. ch. 93A and that plaintiffs' motion be **GRANTED** on all defendants' counterclaims.

## II. Background and Prior Proceedings

Background facts and a summary of proceedings through September 14, 1992, are comprehensively set forth in Judge Woodlock's Memorandum and Order denying plaintiffs' motion for a preliminary injunction. (Order Denying Prelim. Inj. at 1–9, Docket no. 52.) It is unnecessary to restate in detail the matters covered in Judge Woodlock's Order, but a few highlights, supplemented by later developments and disclosures, will help put the present motions in context.

Discovery has indisputably revealed that the C.A.T. Ball is a direct descendant of a large foam ball that Roy Carlson developed and introduced to the market in the early 1970s. (Defs.' Fact Statement ("FS") pursuant to D.Mass.R. 56.1 ¶¶ 5–8, Docket no. 86.)[1] A Denver Broncos' coach named Robert Gambold ("Gambold") introduced the Carlson ball to the Broncos and Coach Moore in 1972. (Gambold Aff. ¶ 14, Docket no. 89.) The Carlson ball, marketed under the trade name "Last–A–Foam," was approximately the same diameter (30 inches) and weight (30 pounds) as the ball that Coach Moore, years later, asked defendants to produce. (*Id.* ¶¶ 3–7.) The Last–A–Foam ball was contemporaneously described and pictured in marketing brochures, and its use was demonstrated in training films that Gambold and Carlson jointly produced. (*Id.* ¶¶ 8, 12–13.) Gambold personally taught Coach Moore drills in which the Last–A–Foam ball was used to simulate a "cut block," a type of block in which an offensive player attempts to knock a defensive player to the ground by diving at and throwing his body across the defensive player's knees. Gambold and Coach Moore also freely permitted high school coaches and players to observe drills in which the Last–A–Foam ball was used, and many took advantage of the opportunity to do so. (*Id.* ¶¶ 16–17.)

While the Last–A–Foam ball performed a useful training function, it had a significant drawback: it tended to develop surface cracks, particularly around the seam at which its two hemispheres were joined together. Eventually, it would simply split in half at the seam and have to be taped or glued back together. (*Id.* ¶¶ 18–20.) A problem as obvious as this, not surprisingly, was visible to all users, including Gambold. Gambold also recognized that, since the cracking and splitting tended to occur at the seam, a solution might be to manufacture the ball in a single piece. (*Id.* ¶ 20.)

On and off over the years, Coach Moore worked with a series of consultants and spent approximately $5,000 of his own money, (FS ¶ 33), in an effort to develop his own product: one that would be resistant to the splitting and cracking that were evident to him, to Gambold, and to all users of the Last–A–Foam ball from at least as early as 1972. These efforts met with varying degrees of success, but cracking at the seam of Coach Moore's product remained a problem prior to 1991. During the time Coach Moore was undertaking to perfect the C.A.T. Ball, he used various versions of it as a training device and when promoting its use to others. One of Coach Moore's disciples, Coach Bruce Johnson, estimated that thousands of coaches and players observed the use of the C.A.T. Ball in live drills or on videotape. (FS ¶¶ 92–93.) The ball was even featured in newspa-

---

1. Pursuant to D.Mass.R. 56.1, it was incumbent on plaintiffs to include in their opposition to defendants' summary judgment motion "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried." They failed to do so, relying, instead, on their own purported "Statement of Facts," comprising pages 1–15 of their memorandum in opposition (Pls.' Mem.Opp.Def. Mot.Summ.J., Docket no. 94.) D.Mass.R. 56.1 goes on to provide that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." Under this Local Rule, it is therefore appropriate, and may indeed be required, that the court deem admitted the material facts of record stated in defendants' fact statement. Except as otherwise noted, I have deemed such facts admitted, but my recommendation would be the same based upon my independent review of the entire summary judgment record submitted by the parties.

per articles and touted in a 1985 national magazine profile of Coach Moore and his coaching methods. (FS ¶ 82.)

In 1991, Coach Moore was hired as a linebacker coach for the New England Patriots. He brought the ball with him to training camp and used it openly in drills. Soon after his arrival, Coach Moore enlisted the help of the Patriots' equipment manager to set up a meeting between Coach Moore and defendant Neil Gilman ("Gilman"), President of defendant Marty Gilman, Inc. ("MGI"). This meeting occurred on September 5, 1991, in Foxboro, Massachusetts.[2] At the meeting, Coach Moore presented to Gilman a sample C.A.T. Ball and described to him its persistent cracking and splitting problems. He also inquired whether Gilman and MGI would be interested in attempting to develop a ball of approximately the same size and weight, but designed to be more resistant to cracking and splitting and, ideally, less slippery in wet conditions. During the meeting, Coach Moore discussed product specifications and attributes in only the most general terms, leaving it to defendants to experiment with different materials and manufacturing methods in their effort to solve the problems that had plagued the C.A.T. Ball and its predecessor for more than two decades. (FS ¶¶ 45–71.) Coach Moore also advised Gilman that approximately one hundred coaches had expressed an interest in purchasing an improved C.A.T. Ball if the aforementioned problems could be overcome. (Moore Dep. 12/29/91 at 150, FS Ex. 88.)

Several other aspects of the September 5 meeting are significant. First, Gilman claims that Coach Moore falsely represented at the meeting that he had or was about to receive patent protection on the C.A.T. Ball. (FS ¶ 74.) This is the gravamen of defendants' counterclaim. Coach Moore concedes that the C.A.T. Ball is not protected by any patents, (FS ¶ 79), but he denies that he represented otherwise, other than to say that he would have his lawyer send defendants whatever documents existed regarding patents and trademarks.[3]

Second, the parties agree that they engaged in a very general discussion concerning the possibility of entering into a joint business venture if defendants could produce a marketable ball. Coach Moore claims that his "exact words" to Gilman on that subject were as follows:

I have a ball. I have been trying to get it produced, and I have had very poor luck, basically, getting the qualified product that I'd like. And if you were a person that could produce a ball for me, one ball, and it was to my satisfaction, and you were interested in joining in a business venture, I would be interested in talking about it after you have made the one ball.

(Moore Dep. 12/29/91 at 120, FS Ex. 33.) I will assume for purposes of defendants' motion that Coach Moore made a statement to this effect.

Third, the parties agree that they did not discuss the subject of compensation or even whether plaintiffs would reimburse defendants for any time and materials they devoted to the development effort. (FS ¶¶ 48, 49.) Fourth, the parties agree that they did not sign any agreement. (FS ¶ 47.) Finally, Coach Moore concedes that he did not impose any confidentiality restrictions on defendants. (FS ¶ 94.) Specifically, when the question was put to Coach Moore at his deposition whether he told Gilman that "the work he [Gilman] was doing was confidential," Coach Moore responded, unequivocally and without qualification: "No, I didn't—that wasn't talked about." (Moore Dep. 12/29/91 at 119, FS Ex. 94.)[4]

---

2. Coach Moore recalls that the meeting lasted not more than thirty minutes, (Moore Dep. 12/29/91 at 117, FS Ex. 44); Gilman estimates that it lasted no more than fifteen minutes, (Gilman Dep. 12/29/91 at 98, FS Ex. 44).

3. The 1985 magazine profile of Coach Moore, which Coach Moore sent to Gilman after Gilman requested design patent documents, states that "Moore has already applied for a patent." (FS ¶¶ 77–78.)

4. Plaintiffs unsuccessfully attempt to counter this important admission in two ways. First, they point out that Coach Moore also gave the following testimony at his deposition: "In our first meeting ... the comment was made that it's a— between you and I, if it's possible that the ball is going to be made in an order that is acceptable to me, that I would be interested in entering into some kind of a business venture." (Moore Dep. 3/29/94 at 207, Pls.' Appendix of Exhibits, Ex. B,

After the September 5 meeting, Gilman returned to his place of business in Connecticut and, in the weeks following, turned to the task of producing a one-piece ball of the approximate size and weight he and Coach Moore had discussed. During this period, Gilman occasionally sought out Coach Moore's opinion regarding experimental surface textures, proprietary to MGI, that Gilman was developing specifically to make the C.A.T. Ball more grippable in wet weather. Also during this period, Gilman requested, and Coach Moore provided, videotapes demonstrating the use of the C.A.T. Ball during coaching drills. (Moore Aff. ¶¶ 17–20, Pls.' Appendix of Exhibits, Ex. A.) These videotapes were not confidential. In fact, they were the same ones that Coach Moore and others used to demonstrate to other coaches the various uses of the C.A.T. Ball. It was also during this period that Gilman claims he learned, for the first time, that Coach Moore's alleged claim regarding patent protection was false. (FS ¶ 98.)

By December 1991, defendants had succeeded at their own expense in producing a durable, one-piece ball that was slightly smaller (approximately 28 inches in diameter) and slightly lighter (approximately 27 pounds) than the ball plaintiffs had proposed. (FS ¶ 104.).[5] To improve the ball's grippability, defendants provided their version with a pebbled surface texture comprised of a series of hemispheres that defendants themselves had designed specifically for such purpose. (FS ¶ 105.) These several improvements made the ball suitable for mass marketing.

Toward the end of this development process, the parties had their falling out regarding the terms of a possible joint marketing arrangement. Defendants attribute the breakdown of the relationship to their realization in October 1991 that plaintiffs had deceived them at the September 1991 meeting, when Coach Moore allegedly claimed he had a patent on the C.A.T. Ball. Plaintiffs have a different view. They maintain that defendants always knew there was no patent and that they are now claiming otherwise only to cover up what had been their plan from the beginning—to steal plaintiffs' ideas. In any event, in late fall, 1991, defendants notified plaintiffs that they had no interest in

Docket no. 95.) Contrary to plaintiffs' argument, Moore's "between you and I" statement cannot reasonably be construed as a request for confidentiality with respect to the work Gilman would be undertaking, as distinguished from a colloquial way of informing Gilman that he, Coach Moore, would be interested in exploring the possibility of entering into a joint business venture with Gilman if Gilman succeeded in manufacturing a satisfactory ball.

Second, Coach Moore filed a supplemental affidavit dated January 5, 1995, in opposition to defendants' motion for summary judgment. In it, he states, without specific reference to defendants and, more importantly, without any attempt to explain or reconcile the inconsistency between his affidavit and prior deposition testimony, that he invariably told prospective manufacturers and business partners "that the ideas being discussed were to be kept between us." (Moore Supp.Aff. ¶ 2, Pls.' Appendix of Exhibits, Ex. H.) He goes on to state that no one, including Gilman, ever objected to keeping the discussions confidential. (*Id.* ¶ 3.) This vague affidavit, which may refer to nothing more than the "between you and I statement" discounted above, says too little and comes too late. *See, e.g., Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4 (1st Cir.1994) (stating "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit

that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed"); *McGuire v. Acufex Microsurgical, Inc.,* 868 F.Supp. 388, 396 (D.Mass.1994) (declaring that a party who attempts to create an issue of fact by filing an affidavit that is inconsistent with deposition testimony has a duty to provide a satisfactory explanation for the discrepancy); *see also Russell v. Acme–Evans Co.,* 51 F.3d 64, 67–68 (7th Cir.1995) (asserting that a subsequent affidavit should be disregarded when it is in conflict with previous deposition testimony unless the party can explain the discrepancy); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1297 (7th Cir.1993) (concluding that without a satisfactory explanation, a subsequent self-serving affidavit which contradicts deposition testimony cannot create a genuine issue of material fact), *Trans–Orient Marine Corp. v. Star Trading and Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (stating that a party cannot create a genuine issue of material fact by submitting an affidavit contradicting his own sworn testimony). *Cf. Fleet Nat'l Bank v. H & D Entertainment, Inc.,* 96 F.3d 532, 539 (1st Cir.1996) (discounting the value of an affidavit that contains only a general and conclusory assertion similar to Coach Moore's).

5. Defendants estimate that they incurred tooling and construction costs of approximately $42,000 in constructing a one-piece ball. (FS ¶ 72).

marketing the product that Coach Moore called the C.A.T. Ball. Instead, they introduced their own product, which they called the "Shiver Ball." In August 1994, defendants filed for a patent on the Shiver Ball, which was issued on July 18, 1995. The Shiver Ball apparently remains in defendants' catalogue, but it has not been a great success. In the three years 1992, 1993, and 1994, respectively, sales declined from 771 units to 654 units to fewer than 400 units. (FS ¶ 106.) Defendants' 1992 catalogue quotes a price of $170 per unit. (Pls.' Appendix of Exhibits, Ex.S.) Additional facts will be considered below in the context of the specific issues to which they relate.

### III. The Summary Judgment Motions

Pending before the court are defendants' motion for summary judgment on all plaintiffs' affirmative claims, (Docket no. 86), and plaintiffs' motion for summary judgment on all defendants' counterclaims, (Docket no. 82).

The standard for summary judgment is familiar. As set forth in *Medina–Munoz v. R.J. Reynolds Tobacco Co.*:

> Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Not every factual controversy bars a litigant's access to the Rule 56 anodyne:
>
>> [T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.
>
> A genuine issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant would permit a rational factfinder to resolve the issue in favor of either party. The test for summary judgment is steeped in reality. Although the remedy must be withheld if material facts are authentically disputed, there is a burden of production: the party opposing the motion must set

forth specific facts showing that there is a genuine issue for trial. We have interpreted Rule 56 to mean that the evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

896 F.2d 5, 7–8 (1st Cir.1990) (citations and internal quotation marks omitted).

Where, as here, plaintiffs and defendants have both moved for summary judgment, the two motions must be considered independently, with all inferences drawn in favor of plaintiffs with respect to defendants' motion and in favor of defendants with respect to plaintiffs' motion.

### IV. Defendants' Motion for Summary Judgment

#### A. Subject Matter Jurisdiction

Defendants' first argument in support of summary judgment is simply that there is no subject matter jurisdiction over this diversity lawsuit because there is no credible evidence that plaintiffs' recovery will exceed $50,000. *See* 28 U.S.C. § 1332(a) (requiring an amount in controversy of at least $50,000 for original jurisdiction in diversity suits). This argument must be rejected for either of two independent reasons.

First, the amount in controversy requirement is satisfied by a plaintiff alleging a compensable loss of at least $50,000, unless it can be said to a legal certainty that plaintiff did not have a reasonable, good faith basis, at the time suit was commenced, to believe that the recovery would meet the jurisdictional threshold. *Coventry Sewage Associates v. Dworkin Realty*, 71 F.3d 1, 5–6 (1st Cir.1995); *see also St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283,

288–89, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938) (discussing principle that plaintiff's good faith claim of damages controls the amount in controversy question). If the dismissal of some claims causes the amount in controversy to diminish or if the evidence later reveals that the amount in controversy never in fact satisfied the jurisdictional minimum, the federal court nevertheless retains jurisdiction, unless the post-filing events or evidence demonstrate that plaintiff could not have had a reasonable, good faith belief that the jurisdictional amount was satisfied at the time the complaint was filed. *Coventry,* 71 F.3d at 6–7. Applying this standard, defendants have not alleged, and it does not otherwise appear, that plaintiffs lacked a reasonable, good faith basis at the time they filed their complaint to believe that their recovery would exceed $50,000. Therefore, even if I were persuaded that it has now become clear that the admissible evidence will not support a recovery in excess of $50,000, I would recommend that this argument be rejected.

■ Second, notwithstanding defendants' argument to the contrary, it has not become clear that plaintiffs' recovery cannot exceed $50,000. Defendants' argument focuses on a series of assumptions purportedly made by plaintiffs' damages expert. In each instance, defendant claims that the assumption was legally or factually flawed, resulting in an overstatement of plaintiffs' purported damages. I find none of defendants points persuasive at the summary judgment stage, either individually or collectively.[6]

Defendants first challenge plaintiffs' expert's assumption that defendants' sales will continue in perpetuity. This assumption is most likely immaterial given the very high discount rate of 14.84% that plaintiffs' expert used to discount defendants' expected future profits to the present value. With such a large discount factor, it may be presumed that sales more than five or six years after defendants' alleged wrongdoing will account for a very small portion of plaintiffs' claim. In any event, defendants have not even attempted to demonstrate the materiality of this assumption.[7]

Second, defendants argue that the failure of plaintiffs' expert to take into account any portion of fixed costs and overhead unfairly inflates potential profits. Plaintiffs rightly point out, however, that the question of whether such costs would vary as a function of increased sales, and, therefore, the related question of whether any portion of them must be taken into account in projecting net profits, is a question of fact about which the parties' experts may reasonably differ. *See, e.g., Cambridge Plating Co., Inc. v. Napco, Inc.,* 85 F.3d 752, 773–74 (1st Cir.1996) (treating as an issue of fact whether plaintiff's selling, general, and administrative expenses would have increased with increase in sales).

Third, defendants challenge the inclusion in plaintiffs' damage claim of any profits attributable to expected sales to high schools, on the theory that the size of the high school market is speculative and, in any event, the specifications of a ball suitable for the high school market would be different from the specifications of defendants' Shiver Ball. This argument is flawed because the defendants have not demonstrated how, if at all, plaintiffs' expert purported to use her assumption about the size of the high school market. If she merely used *actual* sales of the Shiver Ball to all buyers in the aggregate as the starting point of her analysis and extrapolated from there, then the size of the high school market and the suitability of the Shiver Ball for use in high school football programs would appear to have already been

---

6. I express no opinion about the validity of plaintiffs' expert's methodology or of the assumptions on which plaintiffs' expert relied. Thus, I express no opinion about the ultimate admissibility of plaintiffs' expert's opinion at trial. I simply find that defendants have not carried their heavy burden of establishing at the summary judgment stage that plaintiffs' expert's methodology or assumptions are both indisputably and materially flawed.

7. Similarly, defendants' argument that plaintiffs cannot logically seek both a permanent injunction and disgorgement of post injunction profits that an injunction will prevent defendants from making, even if correct, fails, because I cannot say with certainty, on the basis of the summary judgment record, that defendants will not realize profits in excess of $50,000 between December 1991 and the date of any such future injunction.

discounted by the appropriate amount. In any event, defendants have again made no attempt to demonstrate the materiality of this or the other challenged assumptions. Dismissal for want of subject matter jurisdiction would be inappropriate based solely on the purported existence of a questionable assumption in a damages calculation, where that assumption is most likely immaterial.

## B. The Merits

In addition to challenging the sufficiency of the amount in controversy to satisfy the jurisdictional requirement, defendants challenge the sufficiency of the evidence to support the merits of each of the claims asserted in the complaint. Here, defendants's arguments are more persuasive. They will be discussed in turn.

### Counts I and II:

### Conversion and Misappropriation of Trade Secrets

Counts I and II of the complaint allege conversion and misappropriation by defendants of plaintiffs' trade secrets, in violation of common law and Mass.Gen.L. ch. 93, §§ 42 and 42A. As Judge Woodlock noted in his Memorandum and Order, Sections 42 and 42A "are essentially statutory analogues to the common law of trade secrets and provide, respectively, for monetary and injunctive relief." (Order Denying Prelim. Inj. at 11.) (citing *Burten v. Milton Bradley Co.*, 763 F.2d 461, 462 (1st Cir.1985); *Chomerics, Inc. v. Ehrreich*, 12 Mass.App.Ct. 1. 8–9, 421 N.E.2d 453, 458 n. 14 (1981)). I will therefore discuss Counts I and II without distinguishing between them.

The standard applicable to plaintiffs' trade secret misappropriation claim is governed by *Burten:* "[A] plaintiff alleging misappropriation of trade secrets must show that he shared a confidential relationship with the defendant, possessed a trade secret, disclosed it to the defendant, and that the defendant made use of the disclosure in breach of the confidence reposed in him." 763 F.2d

at 463. Defendants agree that this is the standard, (Defs.' Mem.Sup.Mot.Summ.J. at 8–9, Docket no. 88), as do plaintiffs, (Pls.' Mem.Opp.Defs.' Mot. Summ.J. at 23–5, Docket no. 94). Applying this four part test to the facts reveals that Plaintiffs' claim for conversion and misappropriation of trade secrets must fail because they do not satisfy either of the first two prongs.

### 1. Confidential Relationship

The first requirement is that there exist a confidential relationship between plaintiffs and defendants. The relationship may be express or implied. Plaintiffs say it was both; defendants, predictably, say it was neither.

#### a. Express Confidential Relationship

■ Plaintiffs base their argument that a confidential relationship expressly existed between the parties on three items of evidence. First, they point to Coach Moore's "between you and I" statement discussed *supra* note 4. As previously noted, however, such statement—a plain and explicit reference to the prospect of some future, undefined business relationship—cannot reasonably be construed as a request for confidentiality, and it was not so construed by Gilman. (FS ¶ 50). Nor can it overcome Coach Moore's unequivocal deposition testimony that he did *not* tell Gilman that the development project he was asking Gilman to undertake was confidential; according to Coach Moore, the subject of confidentiality simply "wasn't talked about." (Moore Dep. 12/29/91 at 119, FS Ex. 94).

Second, plaintiffs assert that the parties "discussed that Gilman would have to limit his use of the disclosed information to the development of a prototype C.A.T. Ball for Coach Moore unless the parties entered into a longer term business relationship." (Pls.' Mem.Opp.Defs.' Mot.Summ.J. at 23.) For this proposition plaintiffs cite to pages 119–20 and 123 of Coach Moore's December 19, 1991 deposition.[8] Yet, the cited passages do

---

8. Plaintiffs also point to page 3 of their supplemental answer to interrogatory no. 2 in which they state in conclusory fashion and without specifics, "Coach Moore disclosed to Mr. Gilman on

a confidential basis that the C.A.T. Ball would excel in the marketplace if it was constructed with the following qualities...." (Pls.' Supp.Int.Answer at 3, Pls.' Appendix of Exhibits,

not support the proposition for which they are cited. The purported significance of the first passage, presumably, is the previously-quoted testimony of Coach Moore that his "exact words" to Gilman were:

> I have a ball. I have been trying to get it produced, and I have had very poor luck, basically, getting the qualified product that I'd like. And if you were a person that could produce a ball for me, one ball, and it was to my satisfaction, and you were interested in joining in a business venture, I would be interested in talking about it after you make the one ball.

(Moore Dep. 12/29/91 at 120, FS Ex. 94.)

There is nothing in this language that would reasonably put Gilman on notice that Coach Moore was insisting that Gilman "limit his use of the disclosed information" in the event Gilman succeeded in developing a marketable product but the parties were then unable to reach a business agreement. The meaning of these words is plain: if Gilman could produce one ball to Coach Moore's satisfaction, he, Coach Moore, would consider rewarding Gilman by "talking about" a possible business venture with Gilman. Coach Moore did not request, and Gilman did not give, assurances of confidentiality in the event the discussions about a business venture were unsuccessful or under any other circumstances. As Coach Moore said in his deposition, confidentiality simply "wasn't talked about," (Moore Dep. 12/29/91 at 119, FS Ex. 94), and no amount of backing and filling by plaintiffs can now change that.[9]

Finally, Coach Moore points to his Supplemental Affidavit, discussed *supra*, note 4, in which he asserts that he always told "prospective business partners" that his ideas "were to be kept between us." (Moore Supp. Aff. ¶ 2, Pls.' Appendix of Exhibits, Ex. H, Docket no. 95.) We have just seen the peculiar gloss that Coach Moore placed on his "between you and I" statement and, separately, on the "exact words" he allegedly spoke to Gilman. One charitable interpretation of Coach Moore's Supplemental Affidavit

is that it reflects nothing more than Coach Moore's honest but mistaken belief that statements of the type he claims he made to Gilman expressly communicate to prospective business partners a request that they preserve the secrecy of and refrain from using Coach Moore's ideas. If that is all Coach Moore meant by his statement that he always told prospective business partners that his ideas "were to be kept between us," then, as discussed *supra* note 4, I disagree that Coach Moore's purported words would communicate to a reasonable listener Coach Moore's intended message.

A less charitable view is that Coach Moore, having testified clearly, unequivocally, and accurately that confidentiality "wasn't talked about," now realizes that his candid testimony was prejudicial to his case, and he is attempting to repudiate it. Like many other courts that have considered the issue, I am unwilling to say that a party may never contradict a statement made in deposition by a later-filed affidavit in opposition to a motion for summary judgment. (*See* discussion and cases cited *supra* note 4.) At a minimum, however, in order to preserve the integrity of the summary judgment process, a party that seeks to do so must offer some plausible explanation for the contradiction or some way of reconciling the two apparently conflicting statements. *Id.* Here, plaintiffs' do not offer any explanation, let alone a plausible one, and the only apparent way to reconcile the two statements is in the unsatisfactory manner stated in the preceding paragraph. I therefore hold Coach Moore to his testimony that confidentiality was not discussed and reject the view that an express confidential relationship existed between the parties.

### b. *Implied Confidential Relationship*

The question whether an implied confidential relationship existed is a slightly closer one, but here again defendants must prevail. A convenient starting point for the

---

Ex. G.) This interrogatory answer does not add an issue of fact; it merely reasserts Plaintiffs' interpretations of the September 5 meeting.

**9.** Nothing is found at page 123 of Coach Moore's 12/29/91 deposition which specifically, or even generally, refers to an assertion by Coach Moore regarding confidentiality.

analysis is a comparison of two First Circuit cases: *Burten,* which reinstated a jury verdict in plaintiffs' favor based upon an implied confidential relationship, and *Irizarry y Puente v. President and Fellows of Harvard College,* 248 F.2d 799 (1st Cir.1957), *cert. denied,* 356 U.S. 947, 78 S.Ct. 785, 2 L.Ed.2d 822 (1958), one of the several cases cited with approval in *Burten* for the proposition that "[a]n implied confidential relationship can be defeated ... if the disclosing party voluntarily conveys a trade secret to another without limitation upon its use." *Burten,* 763 F.2d at 463.[10]

The narrow issue on appeal in *Burten* was whether a particular form utilized by defendant game manufacturer, Milton Bradley Co. ("MB"), was effective to disclaim a confidential relationship that would otherwise have arisen when plaintiff game inventors disclosed to MB an electronic board game they had invented. The district court found the question to be a close one, but ultimately held that the disclaimer was effective. 592 F.Supp. 1021, 1036 (D.R.I.1984) (Selya, J.). Thus, it granted defendants' motion for judgment notwithstanding the verdict. *Id.* at 1038. The First Circuit agreed that the question was a close one, but it came out the other way, holding that the disclaimer was not effective. *Burten,* 763 F.2d at 466. Thus, it reinstated the jury verdict for plaintiffs.

Given the narrowness of the issue on appeal, the First Circuit opinion in *Burten* did not (because there was no need for it to do so) squarely address the question why, *without* the disclaimer, an implied confidential relationship arose between plaintiffs and MB. The answer is not obvious, especially in light of the court's citation of *President and Fellows of Harvard College* for the proposition that voluntary disclosure of a trade secret can destroy a confidential relationship. In both First Circuit cases, after all, plaintiffs made what appeared to be a voluntary disclosure of their ideas to defendant. In *Burten,* the idea was for an electronic board game; in *President and Fellows of Harvard College,* it was for a looseleaf tax service addressing foreign tax issues. Why, then, was there an implied confidential relationship in *Burten,* but not in *President and Fellows of Harvard College?*

The answer, which is critical to a determination of whether an implied confidential relationship exists here, is found in the district court opinion in *Burten.* Several key points are apparent from that opinion. First, the evidence at trial in *Burten* established that there was an industry-wide custom, acknowledged by MB and other reputable game and toy companies, "to maintain the secrecy of ideas submitted by outside inventors and to use innovations only if royalties were paid to the inventor." 592 F.Supp. at 1027. In fact, MB not only adhered to, but "fostered such an understanding with outside inventors" and understood "that the industry, as well as virtually all the independent professionals, shared this expectation." *Id.* Second, plaintiffs disclosed their secret to MB exclusively in its capacity as a potential purchaser or licensor of a game idea that plaintiffs had already fully conceived and developed, not in an attempt to induce MB to contribute its own time, money, and expertise to bring to a marketable stage of development a product whose development had stalled. *Id.* at 1026–27. Third, as the *Burten* jury found by "a plentitude of probative evidence," *id.* at 1030, plaintiffs' idea was, indeed, a trade secret, and, presumably, would have plainly appeared to be so to MB. On the basis of these circumstances, the jury could understandably have found that, but for the disclaimer, both parties would reasonably have expected that MB would not disclose plaintiffs' idea to others or use it without payment of a royalty.[11]

10. *Burten* also cited *Wanberg v. Ocean Spray Cranberries, Inc.,* 194 U.S.P.Q. 350, 352, 1977 WL 22790 (N.D.Ill.1977), which, in turn, cited *President and Fellows of Harvard College* for the proposition that, under Massachusetts law, "the voluntary submission of an idea without limitation upon use permits appropriation without any obligation."

11. This analysis is consistent with the district court's observation that, in determining whether a confidential relationship may reasonably be implied, courts "scrupulously avoid[ ]" comprehensive definitions and focus, instead, on "the factual circumstances of each case on an individual basis." *Burten,* 592 F.Supp. at 1031 (citations omitted).

The facts in *Burten* contrast sharply with those in *President and Fellows of Harvard College.* In the latter case, plaintiff solicited Dean Griswold of the Harvard Law School to assist plaintiff in his efforts to develop a looseleaf service devoted to foreign tax law. *President and Fellows of Harvard College,* 248 F.2d at 800–01. Dean Griswold initially expressed interest in the venture and attempted to learn more about plaintiff's expectations concerning his precise role. Plaintiff responded, among other things, by forwarding to Dean Griswold copies of text already written for the proposed service and informing Dean Griswold that many of the hundreds of prospective purchasers to whom he had disclosed his idea had placed advance orders for it. *Id.* at 801. After several months of exploratory correspondence, Dean Griswold broke off discussions with a letter to plaintiff stating that he did not "care to pursue the matter further." *Id.* Years later, the Harvard Law School, in cooperation with the United Nations, become involved in the publication of a series of reports concerning the tax systems of foreign nations, and plaintiff sued, claiming that defendants were misappropriating his previously-disclosed idea. *Id.* The district court granted defendants' motion for summary judgment. The First Circuit affirmed on the ground, among others, that "no ... implied contractual or fiduciary relationship arose" on the basis of "[s]uch a gratuitous unsolicited disclosure as the plaintiff made to Griswold." *Id.* at 802.

Even though *Burten* and *President and Fellows of Harvard College* both involved "gratuitous unsolicited disclosures," key factual differences between the context of the disclosures explain the different results. In the former case, MB had a regular practice of receiving ideas from game inventors and, although it did not specifically solicit plaintiffs, it effectively did the same thing. Thus, it adhered to a well-established industry practice of not using game ideas disclosed to it by inventors without paying for them. Indeed, it "fostered" the view among game inventors that it would not do so, leading to a "shared ... expectation" between outside inventors and toy companies that the inventors' ideas would be held in confidence and not misappropriated. *Burten,* 592 F.Supp. at

1027. In the latter case, there is no indication that Dean Griswold or the Harvard Law School did anything to foster an expectation of confidentiality. They were not in the business of soliciting or purchasing the ideas of outside promoters, and Dean Griswold was approached to apply his own expertise to help bring plaintiff's idea to fruition, not as a prospective purchaser or licensor of that idea. Further, given the fact that plaintiff freely disclosed his idea to Dean Griswold and others, that the idea was not plainly novel, and that, according to plaintiff himself, numerous prospective purchasers were already sufficiently familiar with the proposed tax service to have placed standby orders for it, there was nothing to put Dean Griswold or the Harvard Law School on notice that plaintiff's idea was a trade secret or even that plaintiff himself believed that it was. *President and Fellows of Harvard College,* 248 F.2d at 801. Taking all these circumstances into account, equity did not require that the law treat plaintiff's disclosures as confidential; to the contrary, it would have been inequitable to deprive Dean Griswold of the right to use his own valuable expertise to assist in the advancement of an allegedly similar project.

So it is here. Plaintiffs persuaded defendants to use their own resources and expertise to solve well known problems with a product that had been in the public domain for decades. Defendants did not solicit plaintiffs or do anything to foster the impression that it was their regular practice to seek out and buy the ideas of others; and there was no evidence of an industry custom or practice that would give rise to a shared expectation that defendants would not use any ideas that plaintiffs might gratuitously disclose to them. Perhaps even more important, there was nothing to put defendants on notice that Coach Moore's ideas were confidential or that Coach Moore even believed they were. To the contrary, Coach Moore boasted about the large number of coaches who were familiar with the C.A.T. Ball and were eager to buy it as soon as production models became available. Further, it was no secret that Coach Moore and his colleagues promoted the C.A.T. Ball through coaching clinics and

videotapes and freely used it in practices to which members of the public were invited. Under these circumstances, defendants could not reasonably have been expected to know that plaintiffs were disclosing a trade secret. Finally, defendants certainly could not reasonably have anticipated that plaintiffs would claim the exclusive right to market a product that incorporated technical breakthroughs achieved by defendants for which plaintiffs never paid or promised to pay anything. The law will not find an implied confidential relationship on the basis of facts such as these.[12]

### 2. Existence of a Trade Secret

■ Plaintiffs also cannot establish the second element of their cause of action: the existence of a trade secret. Plaintiffs do not claim trade secret protection for a large foam ball, per se, or for the idea that football coaches could use such a ball to teach techniques for fending off cut blocks. Rather, plaintiffs contend that they possessed a compilation of information that was worthy of protection, including, primarily, the ball's preferred size and weight, the need to make it resistant to cracking and splitting, and, to a lesser extent, the desirability of making its surface less slippery in wet weather. The evidence, however, not to mention common sense, compels the conclusion that these elements, whether taken separately or collectively, do not constitute a trade secret.

At the first meeting between them, Coach Moore readily gave Gilman a ball that was supposedly similar in size and weight to any number of other balls Coach Moore and his colleagues had long found satisfactory. At the risk of stating the obvious, the approximate size and weight of the ball were well known to any of the many coaches and players who had hands on experience with it; indeed, any of them could have weighed and measured it, had they cared to do so. It is not surprising, therefore, that when Coach Moore gave Gilman the sample ball and suggested that he use it as a model, he gave no indication that its size or weight (or anything else about it) was confidential. As it turned out, the ball defendants eventually marketed was smaller (28 inches in diameter) and lighter (27 pounds) than the C.A.T. Ball Coach Moore gave to Gilman at the September 5 meeting. (FS ¶¶ 52, 54–57, 63–69, 104.) Under no circumstances can it be said that there was anything secret about the ball's approximate size and weight.

Similarly, there can be no dispute that it was no secret that existing balls tended to crack and split and that this all too obvious flaw was a commercial drawback. Also, the many coaches, players, and equipment managers who had had actual experience with the ball undoubtedly knew that it was difficult to handle in wet weather. Attaching the label "compilation" to this self-evident list of items that needed improvement does not transform the list into a trade secret.

12. Distinctions similar to the ones noted between Burten and President and Fellows of Harvard College were influential or dispositive in several leading cases. See Atlantic Wool Combing Co. v. Norfolk Mills, Inc., 357 F.2d 866, 869 (1st Cir. 1966) (trade secret protected because misappropriator who "contributed [no] significant technical knowledge, skill or productive effort either in the development of the plaintiff's device or in the design of the defendant's similar structure" will suffer no "unfair restriction on the future use of his own technical knowledge and skill; an imposition, the avoidance of which, often limits the protection afforded trade secrets"); Bowen v. Yankee Network, Inc., 46 F.Supp. 62, 63 (D.Mass. 1942) (no trade secret protection afforded plaintiff's idea for radio program, where there was no evidence "from which it could be inferred that the disclosure of the plaintiff's idea to [defendant] was made under such circumstances as to imply any limitation upon the use of it"); see also Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1549

(11th Cir.1996) (finding that contract between plaintiffs and defendant to design computer equipment did not create an implied confidential agreement and plaintiff's "unilateral assertion that they had a confidential relationship," without more is insufficient); Smith v. Snap–On Tools Corp., 833 F.2d 578, 580 (5th Cir.1987) (declaring that there is no implied confidential relationship when plaintiff "disclosed the invention of his own initiative ... [and] without discussing pecuniary recompense for his suggestion."); Kearns v. Ford Motor Co., 203 U.S.P.Q. 884, 888, 1978 WL 21367 (E.D.Mich.1978) (stating courts do not "find a confidential relationship lurking in every chance encounter"); Laughlin Filter Corp. v. Bird Machine Co., 319 Mass. 287, 289–90, 65 N.E.2d 545, 546 (1946) ("If the plaintiff considered that a confidential relationship was created, that had to be expressed or otherwise brought to the attention of the defendant in order to bind the latter.").

In response, plaintiffs argue, in effect, that even if the market knew about the ball and it problems, defendants did not. Assuming, *arguendo*, that this is true, it does not make plaintiffs' information a trade secret. To be a secret, information must be kept confidential.

[T]he crucial issue to be determined in cases involving trade secrets ... is whether the information sought to be protected is, in fact and law, confidential.... [I]f the person entitled to a trade secret wishes to have exclusive use ... he must not fail to take all proper and reasonable steps to keep it secret. He cannot lie back and do nothing to preserve its essential secret quality, particularly when the subject matter of the process becomes known to a number of individuals involved in its use or is observed in the course of manufacture within the plain view of others.

*Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840–41, 282 N.E.2d 921, 925 (1972). Indeed, it is not even enough to warrant protection that the information is known by sufficiently few people to make it commercially valuable. After all, many types of professionals have specialized knowledge and information that they offer to the public in exchange for a fee. But the fact that, for example, a client is willing to pay a lawyer for advice about drafting a will does not mean that the lawyer's knowledge is a trade secret. The same is true here. Whether or not the information conveyed by plaintiffs was new and valuable to defendants, and whether or not it alerted defendants to a potential market about which defendants otherwise would have remained ignorant, the information was already in the public domain. Thus, it was not a trade secret.

This commonsense conclusion is buttressed by consideration of the several factors that courts have often identified as bearing on the existence, *vel non*, of a trade secret. For example, in *Jet Spray Cooler*, which involved the alleged misappropriation by former employees of an employer's trade secrets, the Supreme Judicial Court, citing the Restatement of Torts § 757, Comment b (1939), identified the following six factors:

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

361 Mass. at 840, 282 N.E.2d at 925.

The first of these factors—the extent to which the information is known outside the business—clearly favors defendants, since the approximate size and weight of the C.A.T. Ball and the need to improve its resistance to cracking and splitting were well known to at least hundreds of users and prospective users. The second factor would appear to be irrelevant here, since plaintiffs had no employees. The third factor again strongly undercuts plaintiffs' position, as Coach Moore took no measures to preserve the secrecy of the information he conveyed to Gilman. The fourth factor also favors defendants; plaintiffs derived little, if any, value from the information they conveyed to Gilman, as evidenced by their inability over the course of two decades to develop a marketable product. The same is true with respect to the fifth factor; plaintiffs spent very little—approximately $5,000—on their largely unsuccessful effort to develop the C.A.T. Ball. Finally, plaintiffs can take no comfort from the sixth factor. All the information they say is a trade secret (size, weight, one-piece construction, non-slick surface) would have been evident to the market the moment the ball was introduced, making it exceptionally easy for anyone to acquire or duplicate it. Taking these six *Jet Spray* factors into account, it is indisputable that plaintiffs did not possess a trade secret.

Because there was no confidential relationship between plaintiffs and defendants, express or implied, and because, in any event, the information plaintiffs conveyed to defendants was not a trade secret, I recommend that summary judgment be **GRANTED** to

218

defendants on Counts I and II of plaintiffs' complaint.

## Count III:

### Fraud and Deceit

■ Plaintiffs allege in Count III that defendants fraudulently represented that they would use Coach Moore's disclosures "for the limited purposes of producing a prototype C.A.T. Ball for Coach Moore's use and the opportunity to form an ongoing business arrangement with him." (Compl. ¶ 54, Docket no. 15.) Plaintiffs' have provided no factual support for this allegation. The closest they come is to claim that Gilman "did not object" to Coach Moore's "between you and I" statement. (Pls.' Mem.Opp.Defs.' Mot.Summ.J. at 6.) Plaintiffs' argument for fraud is based on two extremely tenuous assumptions: first, that Coach Moore clearly conveyed to Gilman that Coach Moore's disclosure regarding the C.A.T. ball was for a limited purpose by saying "between you and I," and, second, that Gilman's silence in the face of this statement and his subsequent actions were fraudulent. Putting aside the second assumption—whether mere silence may ever support a claim for fraud and deceit—I have already rejected plaintiffs' claim that Coach Moore's "between you and I" statement would convey to a reasonable listener the idea that Coach Moore "expected the ideas discussed in the conversation to be kept between the parties." *Id.* Therefore, Gilman's silence cannot be construed as his acquiescence to Coach Moore's unstated request. Because defendants made no false statement, and no false meaning can be attributed to Gilman's silence in the face of Coach Moore's "between you and I" statement, I recommend that summary judgment be **GRANTED** to defendants on Count III of plaintiffs' complaint.

## Count IV:

### Breach of Contract

■ Plaintiffs' contract claim is again based on a legally insupportable interpreta-

tion of Coach Moore's "between you and I statement" and the "exact words" Coach Moore allegedly spoke to Gilman at the September 5 meeting. Thus, plaintiffs claim that, in exchange for Coach Moore's disclosure of his ideas and his willingness to consider entering into a business relationship with defendants, defendants "agreed to keep the ideas they discussed with Coach Moore between the parties and to use the information only for the limited purpose of making him a prototype ball to his specifications." (*Id.* at 31.)[13] Again, putting aside the thorny question of whether defendants could have accepted plaintiffs' offer by silence, if such offer had been made, *see, generally,* E. Allen Farnsworth, Contracts § 3.15 (2d ed.1990), defendants' silence cannot be construed as an acceptance here, because Coach Moore never made the offer plaintiffs now contend he did. Regardless of what Coach Moore subjectively might have thought his words meant, they cannot objectively be construed as requesting confidentiality or as imposing any limitations on how defendants might use his ideas. *See Bourque v. Federal Deposit Insurance Corp.,* 42 F.3d 704, 711–12 (1st Cir.1994) (affirming summary judgment on ground that, as a matter of law, defendant's words could not objectively be construed as constituting an offer); *Boleman v. Congdon and Carpenter Co.,* 638 F.2d 2, 4 (1st Cir.), *cert. denied* 454 U.S. 824, 102 S.Ct. 113, 70 L.Ed.2d 98 (1981) (stating "[a] binding offer is made when the offeror leads the offeree reasonably to believe one has been made").

Since Coach Moore's words, as a matter of law, cannot reasonably be construed as an offer to exchange ideas for confidentiality, Gilman's silence, as a matter of law, cannot be construed as an acceptance of such offer. I therefore recommend that summary judgment be **GRANTED** to defendants on Count IV of plaintiffs' complaint.

## Count V:

### Breach of Duty of Good Faith and Fair Dealing

Plaintiffs' argument regarding Count V is based upon the same mistaken belief that

13. It is important to note that plaintiffs are not claiming that there was an enforceable agreement between the parties that defendants would

produce a marketable product or a prototype, or even that they would use best efforts to do so.

Coach Moore's words, combined with Gilman's silence, resulted in an agreement that bound defendants to secrecy and limited the use to which they could put Coach Moore's ideas. (Pls.' Mem.Opp.Defs.' Mot.Summ.J. at 32.) Because there could be no offer, there could be no acceptance or agreement, and, as a matter of law, Gilman could not breach a non-existent duty of good faith and fair dealing. I therefore recommend that summary judgment be **GRANTED** to defendants on Count V of plaintiffs' complaint.

### Count VI:

### Promissory Estoppel

■ Plaintiffs' claim for promissory estoppel is also based on the assertion that Coach Moore told Gilman at the September 5 meeting that "Coach Moore's disclosure and further assistance was contingent upon Moore [sic: should be 'Gilman'] promising to use the trade secrets solely for trying to manufacture a prototype ball." (*Id.* at 33.) This, according to plaintiffs, combined with "[t]he mere fact that Mr. Gilman did not object to these requirements indicates a promise through . . . silence. . . ." (*Id.*) Once again, I put aside the very doubtful premise that a claim for promissory estoppel, as distinguished from one for equitable estoppel, can be based upon the alleged promissor's silence. *See, e.g., Sperry Rand Corp. v. Hill,* 356 F.2d 181, 187 (1st Cir.), *cert. denied* 384 U.S. 973, 86 S.Ct. 1859, 16 L.Ed.2d 683 (1966) (holding that defendant justifiably relied on plaintiff's unjustifiable silence); *Nabisco v. Ellison,* 1994 WL 622136, at *6 (E.D.Pa. Nov.8, 1994) (discussing conflicting authority on whether action for promissory estoppel may be based on silence). There was no promise by silence here by Gilman, because there was no statement by Coach Moore requesting or inviting Gilman to make such a promise. I therefore recommend that summary judgment be **GRANTED** to defendants on Count VI of plaintiffs' complaint.

### Count VII:

### Unjust Enrichment

Count VII is a claim for unjust enrichment. Plaintiffs maintain they are entitled under principles of quasi contract to compensation for services and materials they provided to defendants. Defendants, for purposes of this motion, do not deny that plaintiffs provided some services and materials, but they contend that it was in their self-interest to do so, because they wanted defendants' help in developing an improved ball. Under these circumstances, defendants argue, plaintiffs cannot, in equity and good conscience, expect to be paid for those services and materials. *See Salamon v. Terra,* 394 Mass. 857, 861, 477 N.E.2d 1029, 1032–33 (1985) (stating "[w]here services are rendered by one party and voluntarily accepted by another, the presumption that there is an expectation of payment therefor, as well as an implied promise of payment for the reasonable worth of those services, may be rebutted by a showing of strong self-interest in the outcome of the transaction by the party furnishing those services").

■ To some extent, both parties are correct. When Coach Moore and Gilman initially met on September 5, 1991, Coach Moore, "simply to gain a business advantage" for himself, *id.,* disclosed certain information regarding the C.A.T. Ball's properties, uses, and problems. Because Gilman had not solicited the information and Coach Moore volunteered it purely out of self-interest, Coach Moore could not reasonably have expected Gilman to pay for the information disclosed on this occasion. I therefore recommend that, to the extent plaintiffs' claim for unjust enrichment is based on this initial disclosure, defendants' motion for summary judgment be **GRANTED.**

■ A different analysis applies, however, to the followup information Coach Moore subsequently provided at defendants' request. (Moore Aff. ¶¶ 17–20, 22, 23.) Not only did defendants solicit this information, but, by the time they did so, they allegedly had already decided to market the ball on their own. Thus, according to plaintiffs, defendants were merely feigning interest in plaintiffs' joint marketing proposal as a ploy to induce plaintiffs to provide more free marketing advice. If plaintiffs are correct that defendants in fact obtained the followup information under false pretenses (and, for

purposes of this motion, I must assume they are), then, in fairness and good conscience, they should pay plaintiffs for it. I therefore recommend that defendants' motion for summary judgment be **DENIED**, to the extent plaintiffs are seeking compensation for the information (and materials) they provided at defendants' request *after* the September 5 meeting.

## Count VIII:

### Negligent Misrepresentation

Plaintiffs' claim for negligent misrepresentation is based on the same allegedly false statements that were alleged as a basis for Count III (fraud and deceit). For reasons stated with respect to Count III, namely, that there is no evidentiary support for plaintiffs' claim that defendants made any false statements, I recommend that summary judgment be **GRANTED** to defendants on Count VIII of plaintiffs' complaint.

## Count IX:

### Unfair and Deceptive Business Practices

Plaintiffs allege in Count IX that the conduct complained of in prior counts constitutes unfair and deceptive business practices in violation of Mass.Gen.L. ch. 93A, § 11 ("93A") and Conn.Gen.Stat. § 42–110b ("42–110b"). Defendants argue that, for all the reasons plaintiffs other claims must fail, so must their claim under either the Massachusetts or the Connecticut statute for unfair or deceptive trade practices. For the most part, I agree. With the exception of part of the claim asserted in Count VII for unjust enrichment, plaintiffs' claims are completely devoid of substance and may not be the basis for a claim under 93A or 42–110b.[14] Count VII, however, alleges unjust enrichment, including a charge that defendants, by pretending to be interested in entering into a

joint marketing arrangement with plaintiffs, deceptively induced plaintiffs to impart valuable commercial information without charge after the parties' initial meeting on September 5, 1991. To that extent, Count VII alleges conduct that is sufficiently unscrupulous to constitute a violation of 93A. *See Knapp Shoes, Inc. v. Sylvania Shoe Manuf. Corp.,* 72 F.3d 190, 200 (1st Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 2500, 135 L.Ed.2d 191 (1996) (stating that "unfair or deceptive" trade practices in 93A has been read as requiring a showing of rascality); *Industrial General Corp. v. Sequoia Pacific Systems Corp.,* 44 F.3d 40, 43 (1st Cir.1995) (same).

Because some of the conduct alleged in Count VII, if true, would constitute an unfair trade practice, I will consider two additional arguments defendants make in support of their motion for summary judgment. First, defendants argue that plaintiffs cannot prevail because they suffered no loss of "money or tangible property." (Defs.' Mem.Sup.Mot.Summ.J. at 23.) The cases do not support defendants' contention, however, that 93A protects only "tangible" property. *See Prescott v. Morton International, Inc.,* 769 F.Supp. 404, 407 (D.Mass.1990) (applying 93A to claim for misappropriation of trade secret); *Peggy Lawton Kitchens, Inc. v. Hogan,* 18 Mass.App.Ct. 937, 940, 466 N.E.2d 138, 141 (1984) (applying 93A to theft of recipe for chocolate chip cookies). Here, plaintiffs allege, in effect, that defendants, through their deception, induced plaintiffs to provide valuable consulting services without charge. Although I reject plaintiffs' contention that the advice they provided constitutes a trade secret, their services, like those of a lawyer, doctor, or any other professional, are nevertheless a form of property entitled to protection under 93A.[15]

---

14. I recognize, of course, that 93A "creates new substantive rights by making conduct unlawful which was not previously unlawful under the common law or any prior statute." *Heller v. Silverbranch Const. Corp.,* 376 Mass. 621, 626, 382 N.E.2d 1065, 1069 (1978). Nonetheless, under the circumstances of this case, defendants did nothing wrong when they began selling a ball that incorporated their own technological achievements.

15. Plaintiffs should not be under an illusion about the value of this claim. If they can prove they were deceived into providing free consulting services, the measure of their damages will be the fair market value of those services, not the profits they contend defendants will realize from the sale of Shiver Balls.

Defendants' other argument is that plaintiffs cannot maintain a claim under 93A because the alleged deceptive practice did not occur primarily and substantially in Massachusetts. In addressing this argument, I will consider only facts bearing on the surviving theory that defendants solicited and obtained free consulting advice by pretending to have a continuing interest in the possibility of entering into a joint venture with plaintiffs. The events on which plaintiffs base this claim occurred in September (after the September 5 meeting) and October 1991. Plaintiffs maintain that defendants, from Connecticut, called and sent letters to them in Massachusetts requesting followup materials and information, and plaintiffs responded from Massachusetts by providing the materials and information requested. In other words, plaintiffs maintain that defendants, from outside Massachusetts, initiated communications to them in Massachusetts, pursuant to a scheme that was intended to and did cause them to act in reliance in Massachusetts, with the result that they suffered harm in Massachusetts.

The framework for analysis is well-established. Where a plaintiff's claim under 93A is grounded in fraud, courts consider three factors in determining whether the alleged fraud occurred "primarily and substantially" in Massachusetts within the meaning of 93A. Those factors are: (1) the location of the defendant at the time the allegedly false or deceptive statement was made; (2) the location of the plaintiff at the time the statement was received and relied upon; and, (3) the place of plaintiff's injury. *Arthur D. Little International, Inc. v. Dooyang Corp.*, 928 F.Supp. 1189, 1208 (D.Mass.1996). Of these three factors, "the location of the dissembler at the time he makes a deceptive statement" is of minimal importance, " 'the critical factor [being] the locus of the recipient of the deception at the time of the reliance.' " *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 90 (1st Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995) (quoting *Clinton Hosp. Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1265–66 (1st Cir.1990)). Applying this standard, defendants would have committed an act or practice "primarily and substantially" in Massachusetts if they obtained free consulting services from plaintiffs after the September 5 meeting by feigning interest in a possible joint venture. Plaintiffs received the requests for advice and materials in Massachusetts, responded to the requests in Massachusetts, and suffered harm in Massachusetts when they were not paid for their services. The fact that the alleged "dissembler" was outside Massachusetts at the time he made the requests is of minimal importance.

I therefore recommend that summary judgment be **GRANTED** to defendants on Count IX of plaintiffs' complaint, except to the extent it is based on the surviving portion of Count VII, alleging that defendants feigned interest in a possible joint venture in order to induce plaintiffs to provide free consulting services.

This completes my discussion of defendants' motion for summary judgment with respect to plaintiffs' affirmative claims. I now turn to plaintiffs' motion for summary judgment.

## V. Plaintiffs' Motion for Summary Judgment

### A. Overview of Defendants' Counterclaim and Plaintiffs' Motion

In an eight-count counterclaim, defendants seek recovery, under a variety of legal theories, of approximately $42,000 in tooling and material costs they claim they incurred to develop their Shiver Ball, in reliance on Coach Moore's allegedly false representation at the September 5 meeting that he had a patent on the C.A.T. Ball. Plaintiffs seek summary judgment on all eight counts on a variety of grounds.

For purposes of their motion, plaintiffs accept as true, as they must, defendants' allegation that Coach Moore falsely represented to Gilman at the September 5 meeting that he had a patent on the C.A.T. Ball and that defendants incurred development costs in the amount alleged. They deny, however, that defendants reasonably relied on any such representation by Coach Moore or that such representation caused them any injury.

Defendants oppose plaintiffs' motion in most respects, but they do not respond to plaintiffs' contention that two of their claims—for extortion (Count I) and malicious prosecution (Count VIII)—are clearly defective as a matter of law. I will therefore deem those claims to be waived and will give them no further consideration. Also, I will give no further consideration to Counts II and III of the counterclaim—for fraud in the inducement and breach of the implied covenant of good faith and fair dealing, respectively—because both such counts are rendered moot by my conclusion in Section IV.B. that there never was a contract between plaintiffs and defendants.[16] This will leave for consideration: Count I (to the extent it alleges fraud); Count IV (promissory estoppel); Count V (negligent misrepresentation); Count VI (violation of Mass.Gen.L. ch. 93A); and Count VII (violation of Connecticut Unfair Trade Practices Act ("42–110b")).

### B. Undisputed Facts

The following facts relating to defendants' counterclaim are undisputed, indisputable, or stated in the light most favorable to defendants.

1. The only face to face meeting between Coach Moore and Gilman was in Foxboro, Massachusetts on September 5, 1991. It was at this meeting that Coach Moore first represented that he owned a patent that somehow applied to the C.A.T. Ball. (Gilman Dep. 12/29/91 at 100.)[17]

2. Gilman told Coach Moore at the September 5 meeting that he was unwilling to accept Coach Moore's oral representation that he had a patent that applied to the C.A.T. Ball. In fact, Gilman explicitly told Coach Moore at that meeting that he would not even discuss the possibility of his purchasing Coach Moore's patent or of his entering into a licensing agreement to sell the C.A.T. Ball until he "had in [his] possession the documents which verified that [Coach Moore] had a patent." (*Id.* at 101.) (*See also id.* at 109) (stating, "I [Gilman] told him that no decisions could be made along those lines until I had in my possession documents verifying the fact that he had a patent").

3. Coach Moore did not disclose to Gilman at the September 5 meeting or at any other time the scope or content of any of the claims supposedly set forth in the alleged patent. Therefore, Gilman could not and did not know which aspects of the C.A.T. Ball were supposedly covered by the alleged patent. Gilman assumed that the patent covered the materials and method of construction of the sample ball that he was given at the September 5 meeting. (*Id.* at 114–115; Gilman Dep. 5/25/94 at 133–38, 140, 152, 158–59.) One of the reasons that Gilman insisted that Coach Moore send him the patent documentation was so that he could see what the patent covered. (Gilman Dep. 12/29/91 at 115; Gilman Dep. 5/24/94 at 85.)

4. Without knowing what the alleged patent covered, but assuming, nevertheless, that it covered the sample ball's materials and method of construction, Gilman concluded that the sample ball was an "utter failure," (Gilman Dep. 5/25/94 at 87), which had to be "totally reengineered," (*id.* at 137), using different materials and a different method of construction, and that Coach Moore's ideas for improving the ball were worthless, (Gilman Dep. 12/29/91 at 174). He immediately launched a project to redesign the ball incorporating his own ideas and, within a short time, produced a ball that, as compared to the sample ball whose materials and method of construction he assumed were covered by Coach Moore's patent, was smaller, lighter,

---

**16.** A contract is a necessary element of a claim for fraud in the inducement, *In re Belmont Realty Corp.*, 11 F.3d 1092, 1100 (1st Cir.1993); *Nash v. Trustees of Boston University*, 946 F.2d 960, 962 (1st Cir.1991), and for a claim of a breach of the implied covenant of good faith and fair dealing, *Schultz v. Rhode Island Hosp. Trust Nat. Bank, N.A.*, 1994 WL 326376 at *4 (D.Mass. May 24, 1994), *aff'd* 94 F.3d 721 (1st Cir.1996); *see also Schwanbeck v. Federal–Mogul Corp.*, 412 Mass. 703, 706, 592 N.E.2d 1289, 1292 (1992) (declar-

ing that court does not have to reach issue on whether there was a breach of the duty to negotiate in good faith after finding there was no binding agreement).

**17.** The sections of Gilman's three days of deposition testimony (12/29/91, 4/18/94, 5/25/94) that are referred to in this Report and Recommendation are contained in Defs.' Opp.Pls.' Mot. Summ.J.Defs.' Counterclaims, Ex. B, Docket 93.

made out of different materials, had a different surface texture, and was of one piece rather than two piece construction. (Gilman Dep. 12/29/91 at 76–83, 164–68, 171–74: Gilman Dep. 5/25/94 at 87–90, 137–141, 147–50, 158–59.) This substantially redesigned and reengineered ball is the one that Gilman claims he developed in reliance on the belief that it would be protected by a patent covering the very different materials and methods of construction that were used to make the version of the ball that Gilman deemed to be an utter failure.

5. The next time Gilman spoke to Coach Moore after the September 5 meeting was in a telephone conversation on October 19, 1991. Gilman had placed the call to Coach Moore, in Massachusetts, from a hotel in Baltimore, Maryland. During the conversation, Gilman reminded Coach Moore that he was still waiting for the patent documentation, and Coach Moore informed Gilman it would be forthcoming. Gilman followed up the conversation with a letter dated October 24 in which he again told Coach Moore, as he had at the September 5 meeting, that he "must read them [i.e., the patent documents] over before we can come to an agreement." (Gilman Dep. 12/29/91 at 169–71, Ex. 4.)

6. The third and final time Gilman spoke to Coach Moore was in a telephone conversation during the last week of October 1991. Coach Moore, from Massachusetts, had placed the call to Gilman, in Connecticut, to respond to Gilman's letter dated October 24. Gilman again told Coach Moore, as he had in their two prior conversations, that there could be no deal until he received the patent documentation, and Coach Moore again told Gilman that the documentation would be forthcoming. By this time Gilman, who had first requested documentation concerning the patent at the September 5 meeting, was beginning to feel that he had been duped. (Gilman Dep. 12/29/91 at 179–80.) Shortly after, Gilman asked an attorney to do a patent search, and he subsequently confirmed that

Coach Moore had no patent on the C.A.T. Ball. (Gilman Dep. 5/25/94 at 132–33.)

7. After Gilman learned Coach Moore had no patent on the C.A.T. Ball, defendants completed development of the product they called the "Shiver Ball." They added it to their catalog and have been selling it commercially since early 1992. Defendants applied for their own patent in 1994, and one was issued to them on July 18, 1995.[18]

8. Defendants' intention, from the time they first became involved with Coach Moore, was to reengineer the C.A.T. Ball, at their own expense, and to include the reengineered C.A.T. Ball in their catalog. They assumed that, if Coach Moore's patent covered the reengineered ball, the patent would prevent others from marketing the reengineered ball, but it would also prevent them from doing so without a license from Coach Moore. (Gilman Dep. 12/29/91 at 174–75; Gilman Dep. 4/18/94 at 92–96; 5/25/94 at 134–35). Because, as it turned out, Coach Moore did not in fact have a patent, defendants were able to accomplish their objectives—i.e. to obtain patent protection on the reengineered ball and to offer it in their catalog—without having to obtain a license or otherwise acquire the patent from plaintiffs.

9. The "damages" defendants are now seeking to recover as a result of Coach Moore's alleged misrepresentation are the costs they incurred to redesign and reengineer the ball they are now selling under the protection of their own patent. These are the identical costs they would have incurred if Coach Moore's representation had been true.

### C. Analysis

It is apparent from the foregoing undisputed or indisputable facts that defendants' remaining claims, including claims for misrepresentation, estoppel, and unfair trade practices, must fail because defendants did not rely on any representation by plaintiffs and, independently, even if they did, plaintiffs' representation caused them no injury.[19]

---

18. The patent (U.S. Patent No 5,433,438) was filed in court at the hearing on the pending cross-motions. It may be found in the record at Docket No. 104.

19. Lack of *any* reliance should not be confused with the very different issue whether it was unreasonable as a matter of law for defendants to rely on Coach Moore's unsubstantiated represen-

With respect to reliance, Gilman told Coach Moore, on each of the three occasions in which they discussed the matter, and once in writing, that he, Gilman, was unwilling to rely on Coach Moore's mere representation that a patent existed. He went so far as to tell Coach Moore that he would not even discuss a possible business deal until he had seen and studied the patent. Therefore, by his own admission, Gilman did not in fact assume that Coach Moore had a patent just because Coach Moore said he had one.

Gilman attempts to avoid the potentially fatal consequences of his own repeated admission by claiming that, even though he expressly told Coach Moore on no fewer than four occasions that he was unwilling to rely on Moore's representation, he nevertheless in fact did so, as evidenced by the fact that he promptly launched a project to reengineer the C.A.T. Ball. This reliance theory cannot be reconciled with the undisputed facts, however, and no rational jury could conclude otherwise. To be specific, it is undisputed that Gilman assumed that the patent covered the materials and manner of construction of the existing ball. These are the very things that, in his opinion, accounted for the "utter failure" of the existing ball and that he, therefore, deliberately set out to change. He thus undertook "to totally reengineer" the existing ball to incorporate different materials and methods of construction, which resulted in a ball that was smaller, lighter, and of a different surface texture than the sample ball that he assumed was covered by the patent. No rational jury could conclude that Gilman undertook this total reengineering effort with the expectation that the very different ball he consciously set out to develop would fortuitously be protected by a patent that covered in some unrevealed respect materials and construction methods that he had unequivocally rejected from the outset.

If defendants' clear lack of reliance on Coach Moore's representation were not a sufficient basis for dismissing the remaining claims, the clear lack of any injury caused by such representation surely would. Perhaps the simplest way to demonstrate that Coach Moore's representation could not have caused defendants any harm is to consider the position defendants would have been in if the representation had been true.

If the representation that Coach Moore had a patent had been true, defendants could have been in only one of three positions. First, it is possible that Coach Moore's patent would not have covered defendants' totally reengineered ball. If that had been the case, defendants would have been in a position identical to the one in which they actually found themselves at the end of 1991. That is, they would have been free to market their own ball without obtaining a license from Coach Moore, and they would have incurred the same development costs that they actually incurred, with no claim against plaintiffs for reimbursement.

Alternatively, the reengineered ball might have been covered by Coach Moore's patent, if such patent had actually existed. If that had been the case, there would have been two possible scenarios: either defendants would have come to an agreement with plaintiffs that would have permitted them to sell the reengineered ball under the protection of the patent, or they would not have come to such agreement. Under either scenario, they would have incurred the identical unreimbursed development costs that they presently claim as damages. In the first case, however, they would be marketing the

---

tation that he had a patent. In my opinion, it is not unreasonable as a matter of law for a businessperson, even a sophisticated one, to rely on such a representation, without doing an independent patent search to verify its truthfulness. *See Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1480 (1st Cir.1996) (stating, "it is well established under Massachusetts law that failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation.... Only reliance on preposterous or palpably false representations vitiates a misrepresentation claim.") (citations and internal quotations omit-

ted); *Frequency Electronics, Inc. v. National Radio Co., Inc.*, 422 F.Supp. 609, 614 (S.D.N.Y. 1975), *aff'd* 546 F.2d 497 (2d Cir.1976) (deciding under Massachusetts law that purchaser of invalid patent reasonably relied on seller's representation of validity); *Yorke v. Taylor*, 332 Mass. 368, 374, 124 N.E.2d 912, 916 (1955) (stating, "the recipient of a misrepresentation in a business transaction is justified in relying on its truth although he might have ascertained the falsity of the representation had he made an investigation on his own").

reengineered ball through catalog sales, just as they are doing now, under a patent that belonged to Coach Moore rather than to themselves. This would not put them in a better position. In the second case, having incurred the unreimbursed development costs, they would not be able to market the reengineered ball at all. Again, defendants would not be in a better position.

As this discussion makes clear, defendants are indisputably in no worse position than they would have been had Coach Moore's representation been true. They would have expended the same development costs in any event, and, with respect to their right to sell the ball, they would either be in the same position or one that was worse. They are now free to sell their own ball under their own patent; they do not have to pay a license fee for the right to do so; and they retain complete and exclusive control over the sale by others (including plaintiffs) of any product that incorporates their novel ideas. This is at least as much benefit and protection as they could have hoped to obtain under a license from Coach Moore, if his representation had been true. Granted, defendants are out of pocket $42,000 in development costs, but they would have incurred those same unreimbursed costs in any event. From this perspective, defendants' effort to impose on plaintiffs the development costs for a product they are now featuring in their catalog and on which they have exclusive patent rights is nothing more than an attempt by them to have their cake and eat it too. Indeed, to extend the metaphor, what they now seek is to make plaintiffs pay for that cake.

Because defendants did not rely on any representation by plaintiffs, and because, in any event, Coach Moore's alleged representation did not cause defendants to suffer any legal injury, I recommend that plaintiffs' motion for summary judgment be **GRANTED**.[20]

## VI. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13 (1st Cir.1983); *see also Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

---

**20.** If it were necessary for me to reach the issue, I would also recommend that summary judgment be granted on defendants' CUTPA claim on two other, independent grounds. First, CUTPA does not reach isolated instances of wrongdoing that occur, as here, outside the ordinary course of a person's regular business. *See, e.g., Jokl v. Watt*, 1996 WL 166459 at *2 (Conn.Super. Feb. 28, 1996) (adopting "the reasoning of those courts which have declined to hold CUTPA applicable to a single private transaction by a person not em-

ployed in the business of making the transaction in question"); *Larson & Skiba Associates, Inc. v. C & C Package Store, Inc.*, 1993 WL 524852 at *2 (Conn.Super. Dec. 13, 1993) (same). Second, the relevant unfair business practice would have occurred primarily in Massachusetts at the September 5 meeting, since Gilman incurred most, if not all, the development costs before Coach Moore allegedly repeated the patent representation to Gilman in Connecticut during the last week of October 1991.